**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| SEVEN COUNTIES SERVICES, INC. | ) | CASE NO. 13-31442(1)(11) |
| | ) | |
| _____Debtor_____ | ) | |
| | ) | |
| KENTUCKY EMPLOYEES RETIREMENT | ) | AP No. 13-03019 |
|    SYSTEM | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SEVEN COUNTIES SERVICES, INC. | ) | |
| | ) | |
| _____Defendants_____ | ) | |

## <u>MEMORANDUM OPINION</u>

This matter came before the Court for trial on the Complaint of Kentucky Employees Retirement System (**"KERS"**) against Seven Counties Services, Inc. (**"Seven Counties," or "Debtor"**) for Declaratory Judgment, Dismissal of Chapter 11 Bankruptcy Case and Injunctive Relief, as well as the Debtor's Amended Motion for Approval of Debtor's Rejection of a Potentially Executory Contract with KERS (**"Debtor's Amended Motion to Reject"**), Doc. No. 103, in the main bankruptcy case. For the following reasons, the Court will grant judgment in favor of Seven Counties on each Count of KERS's Complaint and grant the Debtor's Amended Motion to Reject. A Judgment and Order accompany this Memorandum Opinion.

# I.  <u>INTRODUCTION</u>

This case involves Seven Counties' struggle to rehabilitate its financial condition through the United States Bankruptcy Code.  Seven Counties is a charitable organization which provides behavioral health services annually to approximately 33,000 persons living in Bullitt, Henry, Jefferson, Oldham, Shelby, Spencer and Trimble Counties in the Commonwealth of Kentucky.  As of the date the bankruptcy Petition was filed, it provided behavioral health and development services at twenty-one (21) dedicated service locations and one hundred twenty (120) school and community service sites in the Seven Counties area.  It is the largest non-hospital, non-profit entity in the Louisville Metro area.  As a non-profit, charitable organization, all of Seven Counties' revenues in excess of direct costs of its maintenance are devoted to the implementation of its behavioral health programs.  It has operated for over thirty-five years and has thoroughly integrated itself into its service area as a primary safety net for persons with severe mental illnesses, children with severe emotional and behavioral disorders, persons with alcohol and drug addictions, and persons with developmental and/or intellectual disabilities.

Seven Counties owes its existence to a change in the delivery of this safety net function initiated many years ago.  President John F. Kennedy signed into law the Community Health Act of 1963 (the **"Act"**), which was designed to begin the privatization of mental health services.  This ended the historical treatment model based upon state run programs that primarily relied upon institutionalizing the nation's mentally ill citizens.  President Kennedy recognized and designated the mental health of the citizenry as a national priority.  His goal was "comprehensive community care" by using community based treatment through local non-profit corporations as opposed to the

historic government provided institutional care.  The Act provided federal funds to public or non-profit agencies to address mental health at the community level.

The Commonwealth of Kentucky responded in 1964 by passing the Community Mental Health Act now revised and encompassed in Chapter 210 of the Kentucky Revised Statutes.  The metamorphosis from state-run mental health services to a community-based, private non-profit structure has been a monumental success insofar as it involves the treatment of society's most vulnerable persons.  However, issues arising from legislation enacted by the Kentucky General Assembly, coupled with the transition from public to private delivery of behavioral health services, created a legal wrinkle that has amplified over time and now threatens Seven Counties' existence as an operating entity.

The Court's Findings of Fact and Conclusions of Law are necessarily detailed as the matters before the Court cover some fifty-eight years of history that the Court deems essential to its ruling.  To relieve the casual reader of the analytical labors that follow, the Court's ruling is summarized as follows:

1) Seven Counties is a private non-profit corporation organized under Chapter 273 of the Kentucky Revised Statutes[1] and qualified under 26 U.S.C. § 501(c)(3) of the Internal Revenue Code as a tax exempt entity.  While Seven Counties operates as a Community Mental Health Center, as further described herein, and is admittedly an entity subject to regulation and oversight by the Kentucky Cabinet for Health and Family Services (**"Cabinet"**), it is not a "governmental unit" as defined in 11 U.S.C. § 101(27);

---

[1]

(Due to the numerous citations to chapters and sections of the Kentucky Revised Statutes, citations throughout will be as "K.R.S. Chapter _____" and "K.R.S. § ____").  Kentucky Administrative Regulations will be cited as K.A.R.

2) Seven Counties is a "person" under 11 U.S.C. § 101(41) and is therefore eligible for Chapter 11 relief;

3) KERS's demand for a permanent injunction pursuant to 28 U.S.C. § 363(d) and 28 U.S.C. § 959 requiring Seven Counties to continue post-petition "employer required contributions" under K.R.S. Chapter 61 is denied; and

4) Seven Counties is entitled to relief under 11 U.S.C. § 365 in that there exists a contractual relationship between Seven Counties and KERS which may be rejected by Seven Counties in the exercise of its sound business judgment.

The claims raised by Seven Counties in response to KERS's claims also include a request for conclusions of law as to whether Seven Counties is eligible to participate in KERS, whether KERS is a governmental plan, and whether the provisions of KERS run afoul of the Employee Retirement Income Security Act of 1974 (**"ERISA"**), 29 U.S.C. § 1001, *et. seq.* Although this Opinion includes findings of fact relevant to that request, the Court declines to render conclusions of law as unnecessary given the above rulings.

## II. <u>JURISDICTION</u>

This Court has jurisdiction over the matters alleged herein pursuant to 28 U.S.C. § 1334(a) and (b) and Title 11 of the United States Bankruptcy Code. Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409. These matters are core proceedings under 28 U.S.C. § 157(b)(2).

## III. <u>PROCEDURAL BACKGROUND</u>

On April 4, 2013 (the **"Petition Date"**), Seven Counties filed its Voluntary Petition for relief under Chapter 11 of the Bankruptcy Code commencing Case No. 13-31442. The procedural history of the bankruptcy main case and this adversary proceeding are quite involved and extensive.

Currently at issue are the demands for relief by KERS in Counts I, II and III of this Adversary Proceeding and Seven Counties' Amended Motion to Reject an executory contract with KERS and/or Kentucky Retirement System (**"KRS"**).  On June 10, 2013, KERS filed its Complaint in accordance with this Court's May 8, 2013 Order commencing Adversary Proceeding No. 13-03019 (**"Adversary 3019"**).   Contemporaneously therewith, KERS filed a Motion for Preliminary Injunction to Compel Seven Counties to Comply with its Statutory Obligations, based on Count III of the Complaint, to compel Seven Counties to fulfill what it claimed were its postpetition statutory obligations under K.R.S. Chapter 61 and K.A.R. Title 105.  In addition, KERS and KRS filed their Motion to Dismiss Adversary Proceeding 3014 (**"Adversary 3014"**)[2] and Seven Counties filed its Motion to Dismiss this Adversary Proceeding.

On September 10, 2013 through September 18, 2013, a hearing was held on the Motions to Dismiss, as well as the Motion for Preliminary Injunction.  The Court issued its oral ruling from the bench.  The Court found that KERS failed to meet its burden regarding the four factors required for a grant of a preliminary injunction: (1) the likelihood that it would succeed on the merits at a trial in the future; (2) whether KERS would suffer irreparable injury without the issuance of a preliminary injunction; (3) whether the injunction would harm others; and (4) whether the public interest would be served by the Court imposing the injunction.  *Unsecured Creditor's Comm. Of DeLorean Motor Co. v. DeLorean*, 755 F.2d 1223, 1228 (6th Cir. 1985).

The Court stated that it was not consolidating the trial on the merits with the hearing on the Motion for Preliminary Injunction under Bankruptcy Rule 7065, that this matter would go to trial,

---

[2]

Adversary 3014 was filed by Seven Counties against KERS and seeks declaratory judgment relief.

and that the evidence introduced was preserved for trial. This was memorialized in an Order filed September 20, 2013, as well as in the Memorandum Opinion and Order filed on November 8, 2013.

At the preliminary injunction hearing the Court found that Seven Counties is a Kentucky non-profit corporation and is designated as a community mental health organization under Kentucky Revised Statutes. By executive order, Seven Counties became a participant in KERS. Upon becoming a participant, Seven Counties was required to collect its employees' contributions for KERS and make its own contribution on behalf of the employees. The Court further found that KERS requires contributions from participating employers in excess of what Seven Counties can afford.

The Court found that nothing in the Kentucky Revised Statutes allows the governor to put a member on the board of Seven Counties, the General Assembly does not appropriate funds directly for the payment of Seven Counties' operations, and Seven Counties is an independent entity and owns its own real estate. The Court further found that the manner in which Seven Counties is designated as a community mental health center under the Kentucky Revised Statutes indicates that it is not a governmental entity. The primary remedy for the state's displeasure with the actions of a Community Mental Health Center is de-designation as a Community Mental Health Center by the Cabinet. De-designation is unnecessary for state controlled entities.

On November 8, 2013, the Court entered a Memorandum Opinion and accompanying Order in this adversary proceeding and Adversary 3014 denying each of the parties' Motions to Dismiss.

On November 22, 2013, KERS filed its Notice of Appeal of the Memorandum Opinion and Order Denying the Motion to Dismiss Adversary 3014. Also on November 22, 2013, in conjunction

with the Notice of Appeal, KERS filed its Motion for Stay of Adversary Proceeding Pending Resolution of Appeal of Denial of Sovereign Immunity (the **"Motion to Stay Adversary 3014"**).

With respect to the Memorandum Opinion and accompanying Order entered in this adversary proceeding, on November 8, 2013, KERS filed a Motion to Clarify Order Denying Motion to Dismiss (the **"Motion to Clarify"**) on November 22, 2013.  Following a hearing held on December 17, 2013, the Court issued an Order on December 20, 2013 in which it *sua sponte* ordered "that references to the term 'governmental entity' by the Court in its oral Findings of Fact and Conclusions of Law issued on September 18, 2013 denying KERS's Motion for Preliminary Injunction are changed to the term 'governmental unit' to accurately reflect the Court's intent . . . ."

On February 14, 2014, KERS filed its Motion to Stay Issues Involving the Claims Asserted in Adversary 3014 Pending the Appeal in this Adversary 3019 (the **"Motion to Stay 3014 Issues"**).

The Court held a pretrial hearing on February 25, 2014, during which it reiterated that the evidence presented during the five-day September hearing need not be repeated at trial as it was already part of the record.

On February 26, 2014, the day after the District Court denied the Motion for Leave to Appeal in Case No. 3:13MC-33-JGH as unnecessary, the Notice of Appeal filed in Adversary 3014 was docketed with the District Court in Case No. 3:14-cv-00189-JHM.

Prior to the beginning of trial on March 3, 2014, the Court held a hearing on the Motion to Stay 3014 Issues in this Adversary 3019 and denied the same on the basis that the Notice of Appeal from Adversary 3014 had just been docketed in Case No. 3:14-cv-00189-JHM, and because the District Court, in its Memorandum Opinion and Order entered in Case No. 3:13MC-33-JGH, had

stated that "the Court believes that the Bankruptcy Court in the Seven Counties adversary action [Adversary 3014] is in the best position to determine whether going forward with its trial is an appropriate and efficient use of the Court and parties' time." (Mem. Op. and Ord. at 1, Case No. 3:13MC-33-JGH).

## IV.  THE PARTIES

### A.  Seven Counties.

#### 1.  The Organization of Community Mental Health Centers in the Commonwealth of Kentucky.

On October 31, 1963, Congress enacted the Community Mental Health Centers Act, Pub. L. No. 88-164, 77 Stat. § 200, 282, 290 (1963).  Kentucky created the Kentucky Mental Health Planning  Commission to prepare "a long-range plan for developing within the Commonwealth a pattern of mental health services," giving special consideration to "both public and private efforts and their coordination . . . ." Ky. Exec. Or. 64-207 (Mar. 17, 1964).  In 1966, the Commission published a Pattern for Change in Kentucky Mental Health Programs and Services, which represented the Commission's findings. Ky. Mental Health Planning Comm., Pattern for Change in Kentucky Mental Health Programs and Services, 33 (1966).

In response, in 1966, twenty non-profit corporations were incorporated to provide community mental health services in Kentucky.[3]  In order to be a CMHC recognized and designated by the Cabinet, the entity must be a non-profit corporation organized under Chapter 273 of the Kentucky Revised Statutes.  One of these was Kentucky Region Eight Mental Health-Mental

---

[3]

Hereinafter, the **"Community Mental Health Centers"** or **"CMHCs,"** though variously also called **"Mental Health-Mental Retardation Boards," "MH-MR Boards," "Regional Boards,"** and **"Community Boards"** by the evidence and the parties.

Retardation Board, Inc. (**"Region Eight"**), which filed for incorporation as a non-profit organization on June 29, 1966. Region Eight, later known as River Region Mental Health-Mental Retardation Board, Inc. (**"River Region"**), served the same seven counties (an area known in Cabinet/CMHC vernacular as the "catchment") now served by Seven Counties.

Over time, the number of CMHCs declined to its present number of fourteen, each of which has a defined catchment within Kentucky in which it is the sole CMHC authorized to provide behavioral health services. The CMHCs are all non-profit corporations operated under the oversight of a corporate board of directors and exempt from federal, state, and local income taxes.

### 2. CMHCs Join KERS.

Many of the individuals who worked for CMHCs at their inception had previously worked for state government and received credit towards retirement benefits with KERS. Daniel S. Tuttle was the Acting Commissioner of the Department of Mental Health from September 1964 to October 1965 and Deputy Commissioner for the Administration at the Department of Mental Health until June 1967. During the time he served as Acting Commissioner, the Department of Mental Health established the program of developing the CMHCs. Mr. Tuttle stated in an affidavit dated February, 1971, "Prior to this time the Department of Mental Health had been rendering services on a local level in the area of mental health and mental retardation through its division of community services." Mr. Tuttle went on to explain the reasoning behind the CMHCs joining KERS:

> Since the beginning of these local centers, much of the services rendered were made by state employees, and it became necessary to transfer these employees from the status of state employees to the status of employees of the local centers. This in turn created a personnel problem in that many of these employees were reluctant to leave state employment because of the retirement benefits they had built up as state employees. After conferences with the Kentucky Employes (sic) Retirement System the Department of Mental Health requested the Governor to allow by Executive

Order such employes (sic) to continue to participate in the Kentucky Employes (sic) Retirement System.

On June 23, 1966, Governor Breathitt issued Executive Order 66-378, which declared "it is my desire and that of the State Department of Mental Health that regular, full-time employees of community mental health boards which have been recognized by the Commissioner of Mental Health to provide regional community mental health-mental retardation services be covered in the Kentucky Employes (sic) Retirement System." Ky. Exec. Ord. 66-378, June 23, 1966. The Order further stated, "that effective July 1, 1966, community mental health boards are permitted to become and are participating agencies in the Kentucky Employes (sic) Retirement System." *Id.* Thus began the legal wrinkle: the inclusion of employees of private entities in the Kentucky Retirement System (**"System"**). This expansion applied to all CMHC employees, not just those transitioning from employment by the state.

Participation in the System worked well for most of the CMHCs, but three of the CMHCs, Region Eight, Nineteenth Regional Mental Health-Mental Retardation Board, Inc., and Twentieth Regional Mental Health-Mental Retardation Board, Inc., declined to participate and chose instead to establish tax-sheltered annuity retirement programs for their employees. KERS brought a declaratory judgment action against the three non-participating CMHCs in Franklin Circuit Court to force their participation in the System. The Kentucky Attorney General's Office represented KERS in that lawsuit. While the Franklin Circuit Court entered judgment in KERS's favor, the judgment was ultimately reversed by the Kentucky Court of Appeals in *Kentucky Region Eight Mental Health-Mental Retardation Board, Inc. v. Commonwealth*, 507 S.W.2d 489 (Ky. 1974), for reasons discussed more fully below. During the appeal, Region Eight cited extensively to Mr. Tuttle's affidavit, which was also admitted into evidence in this case.

-10-

3. **River Region's Bankruptcy.**

On February 23, 1978, River Region filed in this Court for relief under Chapter XI of the Bankruptcy Act of 1898. In its petition, River Region identified itself as "a non-profit corporation formed under the provisions of Chapter 273 of the Kentucky Revised Statutes." In that capacity, River Region stated that it acted "as an administrator of a Regional Community Health program, pursuant to KRS 210.370, *et. seq.*, which provides for such programs and permits such a program to be administered by a non-profit corporation."

On July 10, 1978, River Region filed a Motion for Adjudication as Bankrupt. In seeking this adjudication, River Region asserted that it had been unable to formulate a plan of arrangement pursuant to the provisions of Chapter XI. As a consequence of its financial condition and inability to formulate a plan, River Region asked the court to adjudicate it as bankrupt.

On the same day, the Department for Human Resources[4] filed a motion as an "interested party" in support of River Region's request. The Department for Human Resources urged the Court not to immediately adjudicate River Region as bankrupt, as a termination of its business would result in a cut off of mental health services to River Region's catchment. To prevent such a cessation of services, the Department pledged to provide the operating expenses of River Region until August 1, after which a then-new entity, Seven Counties, had agreed to assume responsibility for the River Region area.

An employee group twice challenged River Region's right to be adjudicated bankrupt, contending that River Region was clearly formulated, organized, and operated exclusively by and

---

[4]

This department was a predecessor to the Cabinet for Health and Family Services.

for the Commonwealth of Kentucky and was nothing more than the alter-ego and surrogate of the Kentucky Department for Human Resources.  The group failed twice.

On January 8, 1980, the Court issued its opinion and found River Region was not a state agency or instrumentality.  *Greenberg v. River Region Mental Health-Mental Retardation Board, Inc.* (*In re River Region Mental Health-Mental Retardation Board, Inc.*), slip op. at *4, Case No. 78-00193-L (Bankr. W.D. Ky. Jan. 8, 1980).

First, Judge Bland found that River Region was a non-profit corporation formed to administer mental health and mental retardation services to a seven county service area, had an independent board who were representative of their communities and while highly regulated by the Department of Human Resources, had control of its affairs such that it did not constitute a state agency.

Further, Judge Bland found River Region earned revenue from many sources including "federal and state grants; the United Way; local grant and contract payments; Title XIX and Title XX reimbursements; patient fees and miscellaneous contract payors [sic]," and that the fiscal relationship between the Commonwealth and River Region existed primarily by virtue of contracted-for services.

Judge Bland also rejected the argument that River Region was "a direct taxing entity as to classify it a state instrumentality" finding that the power to impose any *ad valorem* mental health tax required not only the "approval of the State Department of Mental Health," but also hinged on the Fiscal Court of each county within River Region's area enacting "such legislation." *Id.*; *see* Ky. OAG 78-123 (finding *ad valorem* tax only capable of implementation if the Fiscal Court of each

-12-

county enacted independent legislation adopting the tax).  *River Region*, Case No. 78-00193-L, at *6 (Bankr. W.D. Ky. Jan. 8, 1980).

Finally, the Court held "the mere fact that a private organization performs a public function [did] not, *ipso facto*, make that organization capable of state action."  *Id.* (citing *Jackson v. Norton Children's Hospital, Inc.*, 487 F.2d 502 (6th Cir. 1973); *Blackburn v. Fisk Univ.*, 443 F.2d 121 (6th Cir. 1971)).  Settling the matter, Judge Bland found the Kentucky Court of Appeals decision in *Region Eight v. Com.*, discussed above, "dispositive of the issue of whether River Region was a state instrumentality" and that it was not.  *Id.*

An appeal ensued and on September 11, 1980, the United States District Court for the Western District of Kentucky affirmed the bankruptcy court's decision on appeal "in all respects." *Greenberg v. River Region Mental Health-Mental Retardation Board, Inc.* (*In re River Region Mental Health-Mental Retardation Board, Inc.*), Case No. 80-0089-L(B) (W.D. Ky. Sept. 11, 1980). Examining Judge Bland's opinion in a serial fashion, Judge Thomas A. Ballantine, Jr. affirmed and held that River Region was not a governmental entity.

Subsequently, on October 22, 1981, the Court of Appeals for the Sixth Circuit affirmed the district court in a *per curiam* opinion. *See Halikas v. River Region Mental Health-Mental Retardation Board, Inc.*, Case No. 80-5433 (6th Cir. Oct. 22, 1981).  The Sixth Circuit denied rehearing on January 12, 1982.  Thereafter, the United States Supreme Court denied a petition for a writ of certiorari.

4. **Formation of Seven Counties**.

On June 28, 1978 following River Region's unsuccessful attempt to reorganize, Seven Counties was incorporated under K.R.S. Chapter 273 as a non-profit corporation by Dr. Joseph F. Maloney, a professor of political science at the University of Louisville and a citizen involved in various community organizations. On June 29, 1978, River Region's Board of Directors convened and met with Secretary for Human Resources Peter D. Conn. Secretary Conn announced his decision, effective August 1, 1978, to withdraw the Department for Human Resources' designation of River Region as a regional mental health mental-retardation board. Secretary Conn informed River Region of his intent to designate Seven Counties as the successor to River Region. He encouraged all of the River Region staff to apply for positions with Seven Counties. After the Secretary's announcement, the River Region Board of Directors adopted a resolution acknowledging receipt of Secretary Conn's letter and waiving "its right to contest" Secretary Conn's withdrawal of designation. The coordination between River Region, Seven Counties and the Department for Human Resources is reflected throughout this time period due to the concern that River Region's bankruptcy and termination of business would result in a cutoff of mental health services to River Region's customers.

Following litigation in this Court regarding River Region's eligibility for bankruptcy relief, the Kentucky Secretary of State revoked River Region's corporate charter on October 28, 1982, because of a failure to file annual reports.[5]

---

[5]

While K.R.S. § 273.367 has been repealed, the procedure for the secretary of state to dissolve a non-profit corporation endures in K.R.S. § 14A.7-020.

-14-

On August 1, 1978, Seven Counties became the designated CMHC for the seven county catchment formerly served by River Region. In short order, Seven Counties purchased the assets of River Region through the bankruptcy process. In its articles of incorporation, Seven Counties, just as had River Region, identified the following as among its purposes in its articles of incorporation:

> To unify and coordinate comprehensive community and regional mental health and mental retardation service and efforts . . . [t]o apply for, and receive and administer Federal, State, and local funds (public and private) . . . [t]o apply for, receive and administer private funds, such as those contributed by Foundations or other local, State or National organizations . . . [and to] serve as a regional mental health and mental retardation planning body[.]

Seven Counties provides charitable care for clients with demonstrated inability to pay based upon certain criteria. As a charitable organization, all excess revenue over expenses is exclusively used for its maintenance. It has no shareholders or members.

Likewise, Seven Counties' governing document prohibited its Board of Directors from taking any action inconsistent with maintaining its charitable status under federal law. Seven Counties' articles of incorporation also provide for the event of dissolution. The articles state, "In the event of termination, dissolution or winding up of this Corporation in any manner or for any reason whatsoever, its remaining assets, if any, shall be distributed to (and only to) one or more organizations described in Section 501(c)(3), of the [Internal Revenue] Code." The articles of incorporation for Seven Counties and Region Eight are substantially identical. The only substantive differences appearing to the Court are the names of the companies, the location of the original principal offices, the identity and addresses of the incorporators and members of the original boards, and that Seven Counties has a "board of directors" whereas Region Eight had a "board of trustees."

-15-

Except for adopting its separate corporate identity and not assuming debt, Seven Counties was the direct successor to River Region for all business and regulatory purposes.

     5. **The Board of Directors of Seven Counties.**

Seven Counties' original board members included Dr. Maloney, the incorporator, Mrs. V. Joseph Shipman, Mr. Gerald Kirvin, Mrs. Coleman Sibley, Mrs. Robert Tillett, Dr. Paul Shepard and Mr. John Crockett.  At the first board meeting, the board elected several new members.  Seven Counties' Board of Directors is self-perpetuating, and the membership of the Board – both to remove existing members and appoint new members – is determined by a majority vote of the Seven Counties Board of Directors.  The provisions of Seven Counties' bylaws concerning the election of directors has evolved over the years, and at the time of the petition stated:

> **Section 4. Vacancies and Election of Directors.** If a vacancy occurs among the directors as a result of expiration of term, death,  resignation, removal or otherwise, such vacancy shall be filled by a  vote of a majority of the remaining directors. The Nominating  Committee shall present nominations to fill vacancies as they  occur. In addition to general  nominating procedures and public  advertising, the Nominating Committee shall establish procedures  providing for nominations by petition. Any person not placed in  nomination by the committee, but who is qualified, may have his  or her name placed on this list of nominees by presenting a petition  for nomination signed by 25 registered voters of the area served by the Corporation. Applicants shall be allowed sufficient time to  prepare and execute such petitions prior to the date of the election and after initial public advertising has been placed. The Board  must vote on a petitioning nominee, as well as on the slate placed in nomination by the Committee.

The Nominating Committee was "composed of the Secretary of the Board of Directors (Committee Chairperson) and five members of the Board of Directors appointed by the Chairperson

of the Board."[6] Under any iteration of the bylaws, however, no one associated with the Commonwealth or from outside the board of directors has the power to select members of the board.

Individuals on Seven Counties' Board of Directors may be removed with or without cause by a majority vote of the membership of the Board of Directors. The Board of Directors may further declare a seat vacant if a member of the board is absent from meetings excessively. No one outside the Board of Directors may remove a member of the Board of Directors.

The members of Seven Counties' Board of Directors represent a cross-section of the community, chosen for the broad range of experiences they bring to the company. Members include social workers, attorneys, and leaders in education and other charities. The current Chairman of the Board of Directors is the Hon. David L. Holton II, a Jefferson District Court Judge who testified at both the injunction hearing and the trial. The Chairman of the Board of Directors determines when regular and special meetings will occur. The agenda for each meeting is set by the Executive Committee of the Board of Directors.

The Department for Behavioral Health, Developmental and Intellectual Disabilities ("DBHDID"), the entity most closely involved with CMHCs, has a board liaison to Seven Counties' Board of Directors, Lou Kurtz. Other CMHCs have similar liaisons to their boards of directors. These liaisons are senior officials from DBHDID who are assigned by the Commissioner for DBHDID to each CMHC. Mr. Kurtz has been the liaison to Seven Counties' Board of Directors for approximately a year and a half, and prior to that time served as liaison to the board of directors for Four Rivers Behavioral Health, another CMHC. Over the past year, Mr. Kurtz has attended eight

---

[6]

Post-petition, Seven Counties amended its bylaws to rename the Nominating Committee as the Nominating and Governance Committee, removing the secretary as an ex officio member, and permitting the chairman to appoint all six members.

or nine meetings of Seven Counties' Board of Directors.  He is not a board member and does not vote.

Prior to the filing of the Chapter 11, Mr. Kurtz had no involvement in board meetings other than his presence, according to both Mr. Kurtz himself and Judge Holton.  Since the filing of this case, Mr. Kurtz has been allotted a few minutes to deliver a report from DBHDID.  During a post-petition meeting of the Board of Directors, Mr. Kurtz attempted to involve himself in discussions of program closures, but was instructed by the board to remain silent.  Mr. Kurtz acknowledged in his trial testimony that when the Board goes into executive session, he leaves the meeting.

The Board of Directors has ultimate operational responsibility for Seven Counties and the programs it provides. In the summer of 2013, Seven Counties' Board of Directors determined that it would close a facility in Jefferson County known as the Lighthouse, a center for juvenile drug and alcohol abuse treatment.  Through negotiations with the Cabinet, Seven Counties was able to secure temporary funding to permit the Lighthouse to remain open.  The Cabinet did not find a way to permanently pay Seven Counties to operate the Lighthouse, and Seven Counties' chairman testified that Seven Counties was again facing closing the program.  At trial, Mr. Kurtz acknowledged Seven Counties' right to terminate programs provided it complied with notice provisions in its contracts with DBHDID.

### 6.  The Officers of Seven Counties.

The Board of Directors selects and hires the President of Seven Counties. The President, according to Seven Counties' original bylaws, "shall be responsible only to the Board of Directors for the proper performance of his duties." This position has since been renamed the Chief Executive Officer/President of Seven Counties. The current Chief Executive Officer/President of Seven

-18-

Counties is Dr. Anthony Zipple.  When Seven Counties hired Dr. Zipple, he did not meet with any members of the Cabinet or other state agency before being hired.  Instead, Dr. Zipple's employment agreement  was negotiated with the Board of Directors of Seven Counties, and not with any state employee.

The CEO has responsibility for hiring other senior officers and employees of Seven Counties. Ms. Abbreial Drane is the Chief Financial Officer of Seven Counties.  Prior to being hired, Ms. Drane interviewed with the CEO, the other senior officers, and the finance committee of the Board of Directors.  She did not meet  with any members of the Cabinet prior to her hiring.  Ms. Drane reports to the CEO, who evaluates her  performance and has the authority to remove her from her position.  Ms. Drane in turn has hiring and firing authority over her direct reports, in consultation with Seven Counties' CEO and Vice  President of Human Resources, Lisa Leet.  She does not consult with the Cabinet.

### 7.  Affiliate Organizations.

Seven Counties has also created other companies to assist it in serving the community. In 1985, Seven Counties incorporated SCS Properties, Inc., ("**SCS Properties**") as a non-stock, non-profit corporation, which acted as a real estate holding company for Seven Counties. SCS Properties merged into Seven Counties in 1996.  Today, Seven Counties holds title to numerous parcels of real estate with combined fair market value of over $12 million.  Some of these parcels are encumbered by liens held by Fifth Third Bank.  This real estate has been accumulated by Seven Counties over the years, and is used for its operations.

In 2010, Dr. Howard Bracco, long-time CEO of Seven Counties, incorporated SCS Learning, Inc. SCS Learning provides cognitive training to  children and others with academic difficulties

through its own employees.  Seven Counties may  remove and appoint members of the SCS Learning board at any time, with or without cause.

Seven Counties also contracts with other entities in the community for the provision of services.  Prior to January 1, 2014, only CMHCs could be reimbursed by Medicaid for behavioral health services.  Other providers could contract with CMHCs to provide services, the CMHC would bill those services to Medicaid, and then pay the provider.  Seven Counties calls these  providers "affiliates" and receives a fee for billing these services, but they are otherwise separate  entities responsible to their own constituencies.

### 8.  Relationship with the Cabinet for Health and Family Services.

Today's successor to the Department of Mental Health and the Department of Human Resources is the Cabinet.  The Cabinet is the portion of the Commonwealth of Kentucky that encompases DBHDID and has primary contact with Seven  Counties and CMHCs.  The Cabinet is headed by Secretary Audrey Haynes, who is  responsible for certain oversight functions of CMHCs pursuant to K.R.S. Chapter 210 and Title 908 of the Kentucky Administrative Regulations.

Secretary Haynes testified at trial that the Cabinet is the primary funder for the CMHCs either through Medicaid or through general fund dollars sent to DBHDID.  She stated that the Cabinet has oversight to approve CMHC's annual plans and  budgets, and works with their  boards. The Cabinet asks for accountable outcome data about services that CMHCs have provided.

CMHCs become designated by the Secretary for the Cabinet through an administrative process that requires a CMHC's bylaws, board of directors, and operations to meet certain  minimum standards, and which requires the CMHC to agree to comply with certain statutes, as discussed more fully in the Court's conclusions of law.  In exchange for this compliance, the designation process

-20-

permits the non-profit corporation to be or to become a CMHC and thereby  be eligible to receive significant contracts from the Cabinet and DBHDID specifically.

The Cabinet provides payments to CMHCs solely through contracts, and there is no  direct appropriation from the legislature to any CMHC.  Payments to CMHCs come primarily through contracts with DBHDID or the Department for Medicaid Services.

DBHDID is the department of the Cabinet  that contracts with CMHCs for the provision of community mental health care and contracts with Seven Counties to staff Central State Hospital (**"CSH"**) and Kentucky Correctional Psychiatric Center (**"KCPC"**).  These staffing contracts provide that  Seven Counties employees will be assigned to serve the patients at both of these state facilities.  While Seven Counties provides these employees, the operational control and ultimate responsibility for providing the services at the facilities remains with DBHDID.  CSH has an advisory board made up of individuals from the Cabinet and the CMHCs for the region CSH  serves. Seven Counties continues to report and pay contributions to  KERS for employees assigned to CSH and KCPC because Seven Counties representatives testified that this is based on  DBHDID's request and DBHDID reimburses  all funds necessary for the contributions through the gross amounts paid through staffing contracts.

### 9. **CMHC Statutes and Regulations.**

The relationship between Seven Counties and the state is voluntary whereby Seven Counties requests recognition annually from the Secretary for the Cabinet as the CMHC for its catchment. This recognition enables Seven Counties to obtain state contracts that would otherwise  not be available to it and in return Seven Counties agrees to extensive regulatory oversight.  Without

designation as a CMHC, Seven Counties would still exist, but would operate on a much smaller scale.

The statutes governing community mental health services envision two alternative structures for the providers.  First, a combination of cities or counties may establish a community board for mental health or individuals with an intellectual disability pursuant to K.R.S. §§ 210.370 - .460. Second, the services may be provided by a non-profit corporation.  *Id.*  Some statutes in K.R.S. § 210.370 *et seq.*, are directly applicable to both the community board for mental health or individuals with an intellectual disability and non-profit corporations.  *See* K.R.S. §§ 210.380, .410(1), .420(1), .430 and .440(1) - (3).

Other statutes reference on their face only community boards for mental health or individuals with an intellectual disability, to the exclusion of non-profit corporations.  *See* K.R.S. §§ 210.390, .400, .405, .420(2), .440(4) and .470 (creating a taxing district in all counties which have participated in the establishment of a regional community services program and making the members of the community board for mental health or individuals with an intellectual disability members of the board of the taxing district) and K.R.S. § 210.480 (power to request fiscal courts of component counties to issue tax).

Adding to the vocabulary confusion, the Cabinet's regulations refer to the provider of mental health services as a "regional mental health/mental retardation board."  *See* 908 K.A.R. 2:010.  This is the designation the Cabinet gives to those non-profit corporations chosen apart from all other non-profit corporations to receive state funds.  *See* 908 K.A.R. 2:030(2).  In order to become eligible, the non-profit corporation must "request[] recognition from the Secretary of the Cabinet." *Id.*  This requires the non-profit to agree to comply with K.R.S. §§ 210.380, .400 and .410, among

other requirements. *See* 908 K.A.R. 2:030(2)(2), (2)(4)(b) and (3).  A non-profit  must also agree to set term limits on its directors, comply with the Civil Rights Act of 1964, hold directors meetings twelve times per year, and have certain standing committees, among other requirements.  *See generally* 908 K.A.R. 2:030.  If a non-profit corporation does all these things, then the Cabinet may approve the non-profit  corporation "as a  district mental health/mental retardation board for the purpose of obtaining state funds." 908 K.A.R. 2:030(2).

The most significant regulatory control the Secretary has over a CMHC is to de-designate its recognition as a CMHC.  If a non-profit  corporation is not in compliance with the plan and budget approved by the Cabinet, the Secretary may withdraw her  recognition of the board for mental health or individuals with an intellectual disability or non-profit corporation.  K.R.S. § 210.440(2).  The withdrawal of recognition of a prior entity's designation led to both Seven Counties and Kentucky River Community Care, Inc. becoming CMHCs.  There are emergency provisions in K.R.S. Chapter 210 which will allow the Cabinet under extraordinary circumstances to take control of a CMHC much as the Cabinet undertook with River Region on a temporary basis to ensure patient care during the transition.  K.R.S.  § 210.440.  This authority is limited however.  The Cabinet must provide 30 days notice of its intent to appoint a caretaker and the CMHC may request a hearing for review.  There is no provision in the statutes or  regulations, however, for the Cabinet to dissolve or terminate the corporations serving as CMHCs or to take title to a CMHC's assets in the event of de-designation.

10. **Applicability of Other State Laws.**

Seven Counties' dealings with the state government show that Kentucky treats Seven Counties like a private corporation. As in *In re Las Vegas Monorail*, 429 B.R. 770 (Bankr. D. NV. 2010), Seven Counties "has to obtain licenses and franchises just as if it were a purely private entity." *Las Vegas Monorail*, 429 B.R. at 798. Seven Counties, like all other corporations, must remain updated with its annual reports with the Secretary of State or risk administrative dissolution. *See* K.R.S. §§ 273.3671, 14A.6-010. This was the fate that befell River Region after its bankruptcy liquidation. Bluegrass Regional Mental Health-Mental Retardation Board, Inc. (**"Bluegrass"**) was also dissolved for a period of time for failing to file annual reports. Seven Counties applies for, pays for, and receives various permits and licenses from the state to operate its business.

Seven Counties does not receive direct appropriations from the General Assembly. Instead, Seven Counties receives money from Kentucky only pursuant to contracts with the state. These contracts are awarded only after Seven Counties receives recognition from the Cabinet permitting it to obtain the contracts, *see* K.R.S. § 210.410(1); 908 K.A.R. 2:030(2), and engages in noncompetitive negotiations with the Cabinet. Under the Finance and Administration Cabinet's regulations, the Commonwealth may award contracts "on the basis of noncompetitive negotiations" where the contract is for

> [s]upplies, equipment or services from . . . [a] non-profit organization organized under the laws of the Commonwealth, . . . and lawfully doing business in the Commonwealth of Kentucky, and serving a public purpose of an essentially government, civic, educational or charitable nature[.]

200 K.A.R. 5:309(1)(11) (2013). Seven Counties' non-profit status exempts it and all other non-profit corporations from the competitive bidding process otherwise applicable pursuant to the Kentucky Model Procurement Code.

-24-

Seven Counties is subject to the Kentucky Open Records Act because it derives at least twenty-five percent of its funds expended by it in the Commonwealth of Kentucky from state or local authority funds.  Ky. OAG 02-ORD-222.  Seven Counties may therefore both be a private corporation and a "public agency" solely for purposes of the Kentucky Open Records Act.

Seven Counties is not subject to the Kentucky Open Meetings Act.  The Kentucky Attorney General issued an opinion to Seven Counties which concluded that Seven Counties "is not a public agency under the Open Meetings Act."  Ky. OAG 96-OMD-180 at *2.  At trial, KERS argued that language in Seven Counties' contracts with DBHDID require Seven Counties to comply with the applicable provisions of K.R.S. § 61.805 *et seq.*, the Kentucky Open Meetings Act.  An agreement to comply with these provisions in and of itself does not render Seven Counties a "public agency."

The final statute argued by KERS to be  applicable is the new Chapter 65A of the  Kentucky Revised Statutes, which applies to "special purpose governmental entities."  Seven Counties is not a "special purpose governmental entity."

Concurrently, the legislature amended K.R.S. § 210.400(8) to provide that a "community board for mental health or individuals with an intellectual disability shall: . . . (8) Comply with the provisions of K.R.S. § 65A.010 to § 65A.090."  K.R.S. § 210.400(8).  This statute does not on its face apply to a non-profit corporation.  However, to be the designated CMHC for its region, Seven Counties must state in its bylaws that a purpose of the company is "the implementation of  all functions set forth in KRS 210.400 . . . ." 908 K.A.R. 2:030(2)(4)(b).

Seven Counties is not an "agency, authority, or entity created or authorized by  statute," K.R.S. § 65A.10(8)(a), except insofar as any corporation is "authorized" pursuant to a state's general corporate statutes.  Seven Counties does not exercise less than statewide jurisdiction, K.R.S.

-25-

§ 65A.010(8)(a)(1), except to say that Seven Counties has no jurisdiction.  Seven Counties does not

have policy-making authority.  K.R.S. § 65A.010(8)(a)(3).  Seven Counties may receive public

funds through its contracts with DBHDID, but these are not in the form of grants, awards, or

appropriations.  K.R.S. § 65A.010(8)(a)(4)(b).  As discussed below, Seven Counties does not have

the independent authority to generate public funds.

A private entity cannot be a special purpose governmental entity.  K.R.S. § 65A.010(8)(d)

(4).  "'Private entity' means any entity whose sole source of public funds is from payments pursuant

to a contract with a city, county, or special purpose governmental entity, including funds received

as a grant or as a result of a competitively bid procurement process."  K.R.S. § 65A.010(5)(a).

Seven Counties' sole source of public funds is from payment pursuant to contracts.  Seven Counties

receives public funds pursuant to contracts with the Cabinet and its constituent departments

including DBHDID, but also its contracts with Louisville/Jefferson County Metro Government and

federal agencies.  The definition, taken literally, might make Seven Counties not a "private entity"

because it has other sources of public funds.  That would be absurd, however, as any private

company of significant size would have dealings with local, state, and federal government, and yet

remain a private corporation.  A non-profit corporation formed under K.R.S. Chapter 273 could be

a "special purpose governmental entity," but only if it met the requirements of K.R.S.

§ 65A.010(8)(a).  As the above discussion demonstrates, Seven Counties does not meet this criteria.

The Court therefore finds that Chapter 65A does not apply to Seven Counties.

**11.  <u>Other Agencies of the Commonwealth Consider CMHCs Private</u>.**

Other state government agencies—including KERS prior to this litigation—have regularly

acknowledged that Seven Counties and other CMHCs are private corporations.  In 1981, Barren

River Mental Health-Mental Retardation Board, Inc. wrote to KERS asking to withdraw because it was a private entity. The general manager[7] of KRS responded that the Mental Health-Mental Retardation Boards had always been private non-profit entities.

The Kentucky Secretary of State has twice revoked the corporate charters of CMHCs pursuant to the general non-profit corporate statutes for failure to file annual reports. The first time, discussed above, was when the Kentucky Secretary of State revoked River Region's corporate charter on October 28, 1982. In the second instance, the Kentucky Secretary of State revoked Bluegrass's charter on January 30, 1986, for the same reason. While River Region met its corporate end through the revocation, Bluegrass was able to cure the deficiency and continues operating today.

## B. KERS.

KERS was created in 1956 by the Kentucky General Assembly for employees of the state, its agencies, instrumentalities, and departments designated by the governor. Its purpose is to provide a secure means of retirement savings for state government employees.

Kentucky Retirement Systems (**"KRS"**) was also created in 1956. It is administered by a board of trustees and is charged with the responsibility of administering three of the Commonwealth's retirement systems including KERS; the County Employees Retirement System (**"CERS"**) created in 1958 for county, city, and local government employees; and the State Police Retirement System (**"SPRS"**), which was also created in 1958 for uniformed state police personnel.

---

[7] General Manager is the predecessor title to Executive Director of KRS.

KERS includes both a hazardous and non-hazardous plan. The hazardous and non-hazardous plans are referred to as "plans" but are better described as tiers within a single defined benefit plan. Seven Counties participates in the non-hazardous plan.

The funds of each system administered by KRS are deemed to be trust funds that are to be held and applied solely for its members (current and former employees of a participating employer) and the employees' beneficiaries as provided by applicable statutes. Members include active, inactive and retired employees. K.R.S. § 61.510(8), (24), (37). Beneficiaries are persons designated by a member to receive a portion of the member's benefits—usually a surviving spouse or a dependent of a deceased member. K.R.S. §§ 61.510(26), .515, .645 and .701.

As detailed in the Comprehensive Annual Financial Report (the **"CAFR"**) as of June 30, 2013, the KERS non-hazardous plan consisted of 348 participating employers with 45,969 employees. As of June 30, 2013, the KERS non-hazardous and hazardous plans combined had 44,767 active members; 43,257 inactive members; and 39,552 retired members, for a total of 127,576 participants.

The KRS board has thirteen trustees. Six are appointed by the governor; one is the secretary of the Personnel Cabinet; and the remaining six are elected by the members of each of the systems (KERS, CERS and SPRS). K.R.S. § 61.645(1). The trustees are fiduciaries who administer the funds created by the legislature, and the trustees must make decisions solely in the interests of the members (active, inactive and retired employees of participating employers) and beneficiaries. K.R.S. §§ 61.645 and .650(1)(c)(1).

KRS is an "Agency" within the Executive Branch of the Commonwealth of Kentucky. K.R.S. § 11A.010(7), (10). KERS is part of the Finance and Administration Cabinet within the

Executive Branch of the Commonwealth of Kentucky. K.R.S. § 12.020 II 9(k). The statutes that govern KERS are contained in Chapter 61 of the Kentucky Revised Statutes (hereinafter KERS, KRS and the System are used interchangeably).

KERS and KRS have the "powers and privileges of a corporation" K.R.S. §§ 61.515(1) and .645(2). KERS has the power to act alone pursuant to K.R.S. § 61.515(1). *Bd. of Trustees of the Ky. Ret. Sys. v. Stewart*, No. 2011-CA-000043-MR, 2013 WL 44269, at *3 (Ky. Ct. App. Jan. 4, 2013).

### 1. The Process by which Seven Counties Became a Participant in KERS.

In 1979, the Board of Directors of Seven Counties requested that an executive order be issued that would bring Seven Counties into KERS. On February 14, 1979 Dr. Howard Bracco, executive director, sent the System a letter regarding Seven Counties' participation. The minutes of the February 21, 1979 KRS Board meeting reflect the System's consideration of Seven Counties' participation in KERS. Seven Counties sent a letter to the Kentucky Attorney General asking whether Seven Counties might be eligible to participate in KERS. The Attorney General responded on October 4, 1978, with Ky. OAG 78-685, answering that Seven Counties may participate as the successor to River Region, which had previously participated in KERS. Upon this conclusion, the Governor issued Executive Order 79-78, which recited Seven Counties Board's request to be permitted to join KERS, and the Order thus designated Seven Counties a "department" within the meaning of K.R.S. § 61.510(3).

### 2. How KERS Works.

Chapter 61 of the Kentucky Revised Statutes contains the provisions concerning the operations of KERS and the System. Agencies participating in KERS are required to file a report

of employer and employee contributions, and reimbursements for retiree health insurance premiums on the forms prescribed by the Board.  The source of funds is different for employers that are integral parts of state government.  While employers that represent integral parts of state government participate, their contributions are fully funded by appropriations from the General Assembly through the various cabinets, departments, and agencies.

Today, the applicable statutes set forth numerous duties KERS owes to participating employers.  For instance, the Board of KERS must determine if a department (employer) is eligible since 2003 and qualified for participation in KERS.  *See* K.R.S. § 61.520.  KERS also has the authority to conduct an audit of the employing department at any time pursuant to K.R.S. §§ 61.675 and .526.  KRS and KERS are fiduciaries holding, among other things, the employers' funds.  Similarly, K.R.S. § 61.540 places the burden on KERS to prepare and make available to all members a summary of the plan, as well as notifying members of any statutory changes or administrative practices which may alter the plan by way of a periodic newsletter.  Under K.R.S. § 61.598, KERS is required "to answer inquiries from participating employers" regarding actuarial costs.  Any employer who disagrees with a determination made by KERS under that Section is entitled to request a hearing and appeal the decision.  K.R.S. § 61.645(16).  *See also*, *generally* KRS Employer Reporting Manual (Def's Ex. 280, Prelim. Inj. Ex. 8).

Employee contributions to KERS are 5% of each employee's creditable compensation. K.R.S. § 61.560(1).  For employees that started on and after September 1, 2008, there is an additional 1% health insurance contribution.  K.R.S. § 61.702. Employee contributions are "picked up" by the employer pursuant to K.R.S. § 61.560(4), meaning that the contributions are withheld before tax.  K.R.S. §§ 61.560(4), .543.

-30-

The employer contribution is made up of both the "normal cost" (the cost of funding the benefit earned that year) plus the amount needed to fund the actuarially accrued liability amortized over a fixed period of thirty years starting June 30, 2013.  K.R.S. § 61.565(2), (3).

The KRS board adopts a recommended employer contribution rate that represents the actuarially required contribution rate (the **"ARC"**).  Ultimately, however, the legislature sets the rates in the Executive Branch Budget.  In fifteen out of the last twenty-two years, the rate set by the legislature was less than the ARC.  The employer rates for the KERS non-hazardous system recommended by the KRS board for the period 1990 through 2016, as well as the rates actually budgeted by the legislature, are set forth in Dep. Ex. 191.  On the Petition Date, the KERS employer contribution rate was an amount equal to 23.61% of each employee's "creditable compensation," as defined in K.R.S. § 61.510(13), and increased to 26.79% on July 1, 2013.

Beginning with the fiscal year 2015, which begins on July 1, 2014, pursuant to a changes in K.R.S. § 61.565(3)(c) and (5) made by Senate Bill 2, the General Assembly is required to adopt and fund the full ARC rate as the employer contribution rate.[8]  In addition to providing that the legislature shall fund the full ARC, Senate Bill 2 suspends any further cost of living adjustments ("COLA") unless the COLA is fully funded.

### 3. KERS's Funding Status.

KERS is a multi-employer cost-sharing defined benefit state plan.  As a defined benefit plan, it pays benefits based upon a formula as follows: final compensation × benefit factor × years of

---

[8]

As explained below, the mental health boards have received a specific appropriation from the General Assembly the effect of which is to keep their contribution rates at around 24%.

service credit = annual benefit.[9]  A defined benefit plan, as opposed to a defined contribution plan,

is at risk for underfunding.  The plan is funded by employee contributions, employer contributions

and the return on these investments, yet the benefits paid to retirees are not limited to those

contributions and their earnings.  The solvency of the fund to meet future retirement obligations is

dependent upon consistent payment of the ARC.  The failure to pay the ARC, as that rate is

reassessed annually by actuaries employed by KRS, will almost certainly result in a fund that is

insufficient to pay future retiree benefits.

       KERS's non-hazardous plan was 100% or better funded as recently as 2000.  The decline

in funding since that time is attributable to three main components: (a) the actual contribution rates

set by the legislature have been consistently below the ARC;  (b) market losses in 2000-2001 and

again in 2008-2009, when there was a 17% decline in value of the assets held by KERS; and (c)

unfunded cost of living increases approved by the legislature.

       Already susceptible to underfunding by its design as a defined benefit plan, KERS includes

many private employers.  In 1966, the General Assembly and the Governor opened the System to

include the employees of private non-profit entities, far beyond just those employees transitioning

from public to private employment with a CMHC.  In fact, the Commonwealth extended its promise

to fund future retiree benefits to employees of private entities never envisioned in 1956 when the

General Assembly established KRS as the state government retirement system.

       The expansion of the System to include employees of private entities further exposed the

System to the risk of nonpayment by private entity employers.  The Commonwealth, its various

---

[9]

A defined benefit plan is different than a defined contribution plan such as a 401K plan commonly offered by private
employers.  A 401K plan pays benefits based strictly on contributions and interest earned on those contributions.

cabinets, departments, and agencies will not cease operations. A private entity does not have a guarantee of perpetual existence and can fail. If a private entity is permitted into a cost sharing defined benefit state retirement system, the System assumes liability for future retiree benefits to employees who never worked for the state. Moreover, the System simply cannot force a private entity to pay its employer contributions if it cannot afford to stay in business. This expansion through legislation passed in 1966 (to CMHCs), 1972 (the inviolable contract discussed later) and 1974 (to any entity designated by the governor) by the General Assembly has serious structural flaws. Private non-profit charitable corporations are not likely to improve this situation, especially if payment of the employer's contributions forces them to terminate operations.

In order for Seven Counties to pay employer contributions, it must raise funds from its operations. As a non-profit, all of its revenue in excess of direct costs of its maintenance must be devoted to its charitable purpose of providing behavioral health services. This includes society's most vulnerable citizens, who are entitled to safety net services in the Seven Counties' catchment. The employer contributions to the System reduce Seven Counties' funds needed to fulfill its charitable purpose, thereby jeopardizing its charitable safety net function. Unlike for-profit corporations, non-profits cannot accumulate wealth in the traditional sense. A non-profit does not have shareholders or members who benefit from net income. If a non-profit, like Seven Counties, accumulates assets, it does so solely to implement programs in line with its charitable mission.

Since the filing of its bankruptcy petition, Seven Counties has not withheld employee contributions from the paychecks of most of its employees—those not working at CSH or KCPC. Ms. Drane testified that Seven Counties reported that these employees were terminated on April 6,

2013 because KRS instructed Seven Counties to report in this manner due to the limitations of KRS's web form for reporting employees.

Throughout its history, Seven Counties was able to pay the employer contributions because the rate had been manageable. Had the 1966 legislation permitting CMHCs in the System been limited to only those employees making the transition from public to private entities due to enactment of K.R.S. Chapter 210, Seven Counties would not face this current threat. When Senate Bill 2 was enacted in 2013 requiring participating employers to pay the full ARC rate, Seven Counties was rendered insolvent. Even capping its employer contribution rate at 24% spells the end of Seven Counties. To illustrate this point, for every $1,000 of monthly gross payroll for a participating employee, Seven Counties must fund an additional $240 to the System. This inflates the Debtor's employment expense to $1,240 per $1,000 in gross employee pay. The extra $240 must come from revenues from contracts that require the provision of behavioral health services to customers in its catchment.

Seven Counties' annual gross payroll exceeds $54,000,000. While not all employees participate, the ARC contribution for Seven Counties for 2014 would exceed $14,500,000. This sum added to gross payroll would inflate Seven Counties' employee expense to over $70,000,000. Seven Counties' annual gross revenues hover around $100,000,000. This employee expense liability amounts to over two-thirds of its gross revenue, leaving less than one-third of its revenue for all other expenses needed to fulfill its contracts with the state. These competing demands have placed Seven Counties' Board of Directors in an impossible position. Seven Counties can perform its charitable mission or pay System contributions that will force it to terminate operations. It cannot do both.

-34-

**4. <u>KERS's Historical Determinations of Whether Employers May Participate</u>.**

Prior to 2003, the testimony established that KERS would accept an executive order of the governor causing an entity to participate and that either the governor or the retirement system would, if uncertain about the status of the entity wishing to participate, request an Attorney General's opinion or other supporting analysis. There is evidence, however, that KRS also conducted some independent review of an employer's eligibility to participate in KERS. K.R.S. § 61.510(5) and § 61.520 do not themselves contain any criteria limiting or defining the discretion exercised by the governor when issuing an executive order. On January 25, 1996, KRS sent a letter to Seven Counties regarding SCS Properties' request to participate in KERS. In that letter, based on documents provided by SCS Properties, KRS communicated its determination that SCS Properties was a private, non-profit organization, and could therefore not participate in KERS unless and until SCS Properties obtained a written opinion from the IRS or Department of Labor that SCS Properties was eligible to establish a "governmental plan" as defined in 26 U.S.C. § 414(d) and 29 U.S.C. § 1002(32). The documents reviewed and standard applied by KRS in reaching this determination, however, are not of record.

In 2003, KERS sought a determination from the IRS that its plan was a qualified plan within the meaning of 26 U.S.C. § 401(a). Also in 2003, the statute was amended (for which KERS takes credit) so that KRS must give its assent as a condition precedent to issuance of an executive order for participation. The main reason was to determine an employer's qualification as a governmental entity and to determine ongoing financial responsibility. The result was that K.R.S. § 61.520(1) and (4) were modified to include requirements that an employer must be qualified to begin participation, K.R.S. § 61.520(1), and may continue participation only so long as the employer

-35-

remains qualified. K.R.S. § 61.520(4).  This 2003 revision is the first legislation limiting the governor's discretion to admit a private entity to specific criteria.

Since 2003, whenever an additional employer seeks participation, KERS requests various documentation from the entity such as bylaws,  statutory authorization for the employer to  operate or for the employer's creation, a copy of the employer's budget, and the articles of incorporation if the employer is not an integral department of state government.   If the employer seeking participation is clearly operating under statutory authority and is otherwise  similar to employers that are already participating, then KRS staff would recommend to the  board of KRS that the employer be granted participation.  If there was any uncertainty, the question would be referred to the KRS legal  department, and KERS would issue a letter  recommending that the employer seek a revenue ruling from the IRS that it would be qualified to participate.

In one such letter, written in 2004, KERS  advised a prospective  participant: "To be eligible to participate in KERS, [the applicant] will need to establish that it exercises an essential governmental function and that it is a political subdivision according to state law and the code." KRS required employers seeking to participate to obtain a ruling from the IRS that the employer is a subdivision of the state exercising essential governmental  function under Section 115 of the Internal Revenue Code.  KRS would not grant participation in KERS until the ruling was obtained. As part of these letters to prospective applicants, KRS advised that it applied the IRS's five-factor test from Revenue Ruling 89-49 to determine whether an employer is qualified to participate in KERS.  The five factors are:

- •  Degree of control of state government over organization's everyday operations;

- •  Whether there is special legislation creating the organization;

-36-

- Source of funds for organization;

- Manner in which organization's trustees/operating board are selected; and

- Whether applicable governmental unit considers employees of organization to be  employees of governmental unit.

As recently as January 18, 2012, KRS corresponded with the IRS in a comment to an Advance Notice of Proposed Rulemaking concerning the definition of "governmental plan" within the meaning of 26 U.S.C. § 414(d).  In that letter, from the Chair of the Board of Trustees, KRS represented that the Kentucky statutes that allow employers to participate in KERS pursuant to executive order must be read in light of Section 414(d) of the Internal Revenue Code.  KRS further represented that, as part of its internal review procedure, it had applied the standards contained in Revenue Ruling 89-49 to determine whether a non-profit organization or instrumentality met the federal law standards.  KRS also accepted organizations or instrumentalities that have been determined to be governmental instrumentalities under Section 115 of the Internal Revenue Code. KRS's expressed concern with the Advance Notice of Proposed Rulemaking was that KRS believed there could be a small number of employers that were currently in the Retirement Systems (plans administered by KRS) "that would not satisfy the standards under the final regulations if the final regulations do not closely track Revenue Ruling 89-49 and/or the standards under Section 115" of the Internal Revenue Code.  In this proceeding, KRS has not identified the participants that it believes may not satisfy this standard.  From the evidence at bar, discussed at length below, it seems clear that Seven Counties is among them.  KRS requested that  the IRS amend the proposed rule to "grandfather" in currently participating employers.  Since the introduction of the language to the statute in 2003, KRS has interpreted and applied  the use of "qualified" within  the meaning of

-37-

K.R.S. § 61.520 to consistently use and refer to  Revenue Ruling 89-49 and Section 115 of the Internal Revenue Code.

### 5. **The Extent of CMHC Participation in KERS.**

CMHCs and their employees represent a substantial percentage of KERS participants.  As of June 30, 2013, CMHC employees made  up 5,349 of the 42,226 active members -- those presently employed by a participating employer -- of the KERS Non-Hazardous plans.  CMHC former employees made up 2,283 of the 40,194 retirees and beneficiaries presently receiving benefits.  CMHC former employees who are vested in their benefits but not yet receiving them made up 1,757 of the 8,189 terminated, vested employees, and CMHC former employees who  are not vested in their benefits constitute 7,575 of the 35,857 terminated, non-vested employees.  Altogether, CMHCs represented 16,964 of the 126,466 members in the KERS Non-Hazardous plans, or 13.41% from a straight capitation basis.

Looking solely at Seven Counties, it had 1,219 active employees as of June 30, 2013, including the 926 employees for which Seven Counties has reported to KERS as inactive despite their continued employment.  There are 361 retirees from Seven Counties and their surviving beneficiaries receiving an annual benefit.  There were 283 former Seven Counties employees who are vested in their benefits but not yet receiving them, and there were 1,342 terminated, nonvested employees.  Seven Counties represented 3,205 of the 126,466 members in the KERS Non-Hazardous plans, or 2.53% from a straight capitation basis.

As of June 30, 2013, an employee contributed 5% of his or her wages to KERS as an employee  contribution, and an employer contributes 26.79% of the employee's wages as an employer  contribution. The employer contribution is expected to rise to 38.77% beginning July 1,

2014. The gross annual payroll of all KERS Non-Hazardous employers is $1,644,407,118.00. Of that amount, $199,864,919.00, or 12.15%, is the annual payroll of CMHCs including Seven Counties. Since all employers pay the same employer contribution rate, the CMHC total annual employer contribution of $53,543,811.80 is also 12.15% of the total KERS Non-Hazardous employer contributions of $440,536,666.91. The proportion of contributions from CMHCs compared to all contributions would remain the same for all employer contribution rates.

Seven Counties alone accounts for $54,588,039.00 in annual payroll, which is 3.32% of the total annual payroll for employers in the KERS Non-Hazardous plans. Seven Counties' employer contributions—assuming the 926 employees for which Seven Counties has reported to KERS as inactive despite their continued employment are included—is $14,624,135.65 per year. This annual contribution is also 3.32% of all employer contributions.

### 6. **KERS's Actuarial Health.**

All employers in KERS pay the same employer contribution rate. KRS's outside actuary, Thomas Cavanaugh, determines the contribution rates by calculating the present value for each individual employee's benefit stream using a series of demographic assumptions. The actuary assumes a rate of return on assets of 7.75% to discount the benefit stream to present value, which is KERS's actuarially determined liability. The actuary further analyzes the present assets in the KERS Non-Hazardous plans and uses a smoothing mechanism to calculate the actuarial value of KERS's assets, which allows him to calculate a contribution rate that is not unduly influenced by fluctuations in the market value of KERS's investments at the snapshot in time for which the valuation is performed. The shortfall between the actuarially calculated assets and liabilities is

KERS's unfunded liability.  This unfunded status has exploded by virtue of the defined benefit nature of the plan, underfunding over many years, market drops and changing demographics.

KERS does not have nearly enough money to meet its needs to pay expected benefits.  As of June 30, 2013, the current actuarial value of the assets in the KERS Non-Hazardous pension plan was $2,636,122,852, and the total liabilities were $12,618,726,096.  After accounting for prospective employer and employee contributions, $8,750,479,307 was unfunded accrued liability.  The calculated funding level of the pension plan was 23.2%.  As of June 30, 2013, the current actuarial value of the assets in the KERS Non-Hazardous health insurance plan was  $497,584,327, and the total liabilities were $2,532,227,311.  After accounting for prospective employer and employee contributions, $1,631,169,807 was unfunded accrued liability.  The calculated funding level of the Non-Hazardous health insurance plan was 23.4%.

### 7.  Effect of Seven Counties Termination from KERS.

When Seven Counties or any employer makes employer contributions to KERS, there is no accounting for the contributions by the employer because this is a defined benefit as opposed to a defined contribution plan.  The employer contributions are commingled in the Retirement Allowance Account (**"RAA"**).  The RAA and the deposits from the Insurance Fund are used to pay monthly benefits and to fund KRS expenses.  Employee contributions are deposited into individual member accounts.  When an employee retires, his or her account balance is transferred to the RAA in order to pay the retirement benefits.

Seven Counties' employees have a lower  average age and lower average service time than the average across the KERS Non-Hazardous plans.  This  results in a lower accrued liability for Seven Counties' employees compared to other employers in the system.  While Seven Counties'

employees earn approximately 15% more on average than other KERS Non-Hazardous participants, their retirement benefits are less than 65% of the average benefit. KERS's actuary concluded that this was likely due to the turnover rate for Seven Counties, which is generally higher in the medical field than in general government employment. The lower average age, the lower service, and higher turnover mean that the cost structure or the demographic profile of Seven Counties' employees is less than average for the KERS Non-Hazardous plans.

The result of the cost-sharing nature of this plan, where all employers pay one rate, is that employers with a lower cost structure such as Seven Counties pay more proportionally than do the employers with a higher cost structure. In this case, the effect is magnified, because not only are Seven Counties' employees actuarially cheaper than average, they also make significantly more than average. Since contributions are calculated as a percentage of payroll, this effect is magnified for Seven Counties' high-payroll employees. In other words, if Seven Counties had its own single-employer defined benefit plan, this cheaper demographic profile would result in lower contribution rates for Seven Counties and its employees than in the KERS Non-Hazardous plans.

When an employer ceases to participate in KERS, whether voluntarily, by court action, or by going out of business, the financial impact falls upon the remaining participating employers. KERS's actuary calculated that the employer contribution rate for Fiscal Year 2015 with Seven Counties' participation would be 38.77%, but 39.56% without Seven Counties' participation. The projected employer contribution rate would fall to 33.49% in Fiscal Year 2033 with Seven Counties' participation, but would remain at 36.24% if Seven Counties ceases participation. Should all CMHCs cease participation, the employer contribution rates would be even higher. There is no

mechanism to allow a participating employer to terminate participation and pay KERS as part of the termination.

In fact, the Commonwealth is the largest employer in the System, as one might expect of a state retirement system, and bears the greatest financial responsibility to fund the ARC. It is also largely responsible for underfunding the non-hazardous fund over the years.

Historically, participating private employers are the only ones in the system unable to either exit the system or manipulate the employer contribution. An employee can exit the System by terminating employment and requesting a refund of their employee contributions plus accrued interest. In 15 of the last 22 years the General Assembly, for budgeting reasons, has declined to pay in the ARC. Since the General Assembly has total control of revenues from taxation, it has been in the best position to protect the System over the years.

KERS calculated that the actuarial accrued liabilities for Seven Counties participants are $119,500,064. Given the funding level of KERS Non-Hazardous plans, KERS claims Seven Counties is attempting to leave $90,700,549 in liabilities for other employers to pay. KERS calculates this by multiplying the total accrued Seven Counties liabilities by the funded percentage. KERS argues that Seven Counties is leaving unfunded liabilities in the plans. Because this is a defined benefit plan, there is no existing statutory mechanism to account for Seven Counties' contributions and compare prior contributions and payments to Seven Counties beneficiaries to the present actuarial accrued liabilities. That type of accounting would be typical in a defined contribution plan. Further, it is evident that whether Seven Counties continues its operations under the protection of this Court or closes its doors, it will not have sufficient funds to pay the employer contribution according to the ARC or even at 24%. The requirements of Senate Bill 2 marked the

-42-

end of Seven Counties since as a non-profit charitable organization it has no excess funds to pay this skyrocketing cost.

**8.  Statutory and Regulatory Oversight.**

There is no dispute that Seven Counties is subject to extensive regulation and oversight from the Cabinet.  These regulations are set forth in detail under K.R.S. Chapter 210 and Chapter 2, K.A.R. Title 908.  The parties, likewise, do not dispute that the Cabinet's primary remedy to express its dissatisfaction with a community mental health center is to withdraw its recognition  as a community mental health center under K.R.S. Chapter 210.  The Cabinet may also appoint a caretaker to direct "operation and administration" of a non-profit's programs if it finds an emergency situation exists with regard to the financial stability of a CMHC which jeopardizes the continuation of programs and services.  K.R.S. § 210.440.  The Cabinet, however, does not exercise day to day control of the Debtor's management or Seven Counties' provision of behavioral health services to its patients and customers.

Seven Counties' plan and budget must be submitted to the Cabinet on an annual basis, which includes submission of Seven Counties' Articles of Incorporation and Bylaws.  908 K.A.R. 2:030, Section 2.  The Cabinet has "oversight to approve [the regional mental health boards'] annual plans and budgets."  As an example, for fiscal year 2013, Seven Counties' lengthy plan and budget submission was submitted as Exhibit PX 81.

**9.  Funding from the Commonwealth.**

The General Assembly raises revenue through taxation and appropriates dollars to the Cabinet, which are further allocated in the behavioral health budget to go to DBHDID for mental health services.  DBHDID oversees the allocation of funding for all of the regional mental health

boards, including Seven Counties, based on the criteria in K.R.S. § 210.420.  In addition to the state general funds allocated to DBHDID for the regional mental health boards, all federal dollars for support of community mental health centers, which come from federal agencies such as SAMHSA (the Substance Abuse and Mental Health Services Administration), the National Institute of Health and other agencies under the authority of the Department of Health and Human Services, go through the Cabinet to DBHDID and then to the community mental health centers.

### 10.  **The State Main Contract.**

Each regional mental health board has a primary contract to provide services to those unable to pay in its catchment.  Seven Counties as part of its charitable mission provides charity care for clients with demonstrated inability to pay based upon certain criteria.  DBHDID can only contract with the designated regional mental health board in each region to provide these services.  The funding amounts for the regional mental health boards start with the amounts allocated in the prior year, to which any adjustments are made.  DBHDID enters into a contract with each mental health board to provide the basic "safety net" services within its catchment each fiscal year, which runs from July 1 to June 30 of the following year.  This contract is sometimes referred to as the "State Main Contract." The State Main Contract accounts for over $20 million in annual revenues to Seven Counties (over 20% of its annual revenues).

The State Main Contract also contains cost report audit specifications that provide for audits of regional mental health boards.  Such audits "shall be performed in accordance with Government Auditing Standards (GAS), commonly referred to as generally accepted government auditing standards (GAGAS), issued by the Comptroller General of the United States (July 2007 Revision)." This requires Seven Counties to have its books and records audited in accordance with Government

-44-

Auditing Standards.  In accordance with Government Auditing Standards and the State Main Contract, Attach. C at 56, Seven Counties must obtain an annual audited report which tracks the expenditures of all federal funds it receives under these contracts.  For fiscal year 2012, out of its total contract revenues of approximately $50 million, Seven Counties spent a total of $7,951,082 in federal grant funds.

Dating back to when it was first designated as a regional mental health board in 1978, all of Seven Counties' contracts with the Cabinet and the Department (and their predecessor agencies) have been no-bid contracts.

### 11.  Central State Hospital, Kentucky Correctional Psychiatric Center and Other State Contracts.

The second primary source of funding comes from contracts to provide staffing at CSH and KCPC and a few smaller contracts with the Commonwealth. CSH and KCPC are owned by the Commonwealth[10] and the operations are funded by general fund dollars.

Prior to 1977, River Region operated CSH. In 1977, the Cabinet resumed responsibility for operating CSH.  Seven Counties did not assume responsibility for operating, and has never operated, CSH.  Instead, in the mid 1990's, Seven Counties began to provide staffing services by which it continues to provide a majority of the employees needed to staff the hospital.

Seven Counties is awarded no bid contracts for two year periods with DBHDID to provide staffing to both CSH and KCPC.  These contracts are funded with state general fund dollars.  Seven

---

[10]

Seven Counties holds title to various parcels of real estate, holds commercial real estate leases and has significant personal property.  CSH and KCPC are examples of Seven Counties' business operations performed on state owned property as opposed to real estate to which it holds full title or leases exclusively in its own individual corporate capacity.

Counties has about 300 employees who work at CSH.  There are approximately seventy-five other individuals who work at CSH who are not employed by Seven Counties.

As part of the CSH Contract, Seven Counties describes itself as "a quasigovernmental entity authorized in accordance with K.R.S. § 210.370-210.480."  The contract also identifies Seven Counties as a "governmental body or political subdivision."  The contract also provides,

> At no point shall any individual providing services under this Contract be considered an employee of CHFS, for any purpose, including but not limited to unemployment, taxes, withholding, health insurance, liability, retirement, workers' compensation, vacation, sick or other leave, the Family Medical Leave Act, accrued benefits, evaluations, or any other purpose.  At all times, any such individual shall be considered and deemed to be an employee of the Second Party.

> In no event shall any employee of the Second Party be deemed to be a third-party beneficiary of this Contract or an agent or an employee of the Commonwealth.

The contract for Seven Counties to provide staffing services at KCPC for fiscal years 2013 and 2014 (July 1, 2012 through June 30, 2014) (the **"KCPC Contract"**), signed by Dr. Zipple and in effect at the time the bankruptcy was filed, was introduced as PX 87.  As with the CSH Contract, Seven Counties receives an administrative fee for its services under the KCPC Contract.

The CSH and KCPC Contracts specify that they are funded 100% with state general funds.  As stated before but to reiterate, all KERS's employer contributions are funded by DBHDID through its budgeted funds.  Therefore, the "employer contributions" paid by Seven Counties since the Petition date have been specifically provided for in these contractual sums.  Seven Counties has not used its own funds for these contributions as would be required for employees not working at CSH or KCPC.

With respect to the Seven Counties employees who work at CSH and KCPC, the Commonwealth has management responsibility over those facilities and makes the decisions to hire

-46-

or fire the employees.  With respect to all other employees of Seven Counties (other than those who work at CSH and KCPC), Ms. Leet testified that she has a role in hiring and firing such employees.

### 12. **Medicaid Revenues**.

The third major source of revenues is Medicaid.  On the Petition Date, Seven Counties was the exclusive provider of behavioral health services which could be reimbursed by Medicaid.

For fiscal year 2013, Seven Counties received over $45 million, or 45%, of its total revenues from Medicaid.  With respect to Medicaid funding, which flows to Seven Counties through the Kentucky Department for Medicaid Services within the Cabinet, thirty percent (30%) of that funding comes from the Commonwealth's general fund (from the Kentucky taxpayers) and seventy percent (70%) are federal tax dollars.[11]

The remainder of Seven Counties' revenues (approximately $5 million, or 5% of its revenues) is a combination of Medicare, private pay, donations and miscellaneous items.  Local funding, such as grants, has never amounted to more than approximately one or two percent (1% to 2%) of total revenues.  The levels of funding described herein have been consistent for the past several years. (Drane 3/5/14; PX 11 at 3 (900212))

### 13. **Taxing District and Power to Request a Levy**.

K.R.S. § 210.470(3) provides:

The members of the community board for mental health or individuals with an intellectual disability recognized by the secretary for health and family services pursuant to KRS 210.380 **shall, by virtue of their office, constitute and be the**

---

[11] Managed care for behavioral health services was implemented in the Seven Counties region on January 1, 2013 ("MCO").  As a result, after January 1, 2013 most of Seven Counties' Medicaid revenue flows through one or more of the managed care organizations instead of directly from the Department of Medicaid Services.  Indeed, the implementation of the MCO structure is another problem causing Debtor's cash flow issues. Seven Counties' collection of revenues for services provided has been directly and negatively impacted by MCO administrative procedures.

> **governing board of the taxing district for mental health or individuals with an intellectual disability** and shall perform the duties attendant thereto in addition to their duties as members of the community board for mental health or individuals with an intellectual disability.

(emphasis added).  K.R.S. § 210.470(3) further provides that the "[o]fficers of the community board for mental health or individuals with an intellectual disability **shall be the officers of the taxing district for mental health or individuals with an intellectual disability**." (Emphasis added).

In conjunction with the creation of taxing districts under K.R.S. § 210.470, K.R.S. § 210.480(1) provides, in relevant part, that:

> the community board for mental health or individuals with an intellectual disability, acting as the governing body of the taxing district shall, with the approval of the Cabinet for Health and Family Services, request the fiscal courts in each of the member areas which have not contributed a sufficient proportionate share of the cost of the program, to impose a special ad valorem tax for mental health or individuals with an intellectual disability in such amount that it deems sufficient, but not in excess of four cents ($0.04) per one hundred dollars ($100) of full assessed valuation.

If levied, the special ad valorem mental health tax would be "collected in the same manner as are other county ad valorem taxes and turned over to the community board for mental health or individuals with an intellectual disability to be used for the maintenance and operation of the services program for mental health or individuals with an intellectual disability and clinic as provided in K.R.S. § 210.460."  K.R.S. § 210.480(1)

K.R.S. §§ 210.470 and .480 do not specifically grant the power of taxation to a private non-profit CMHC.

### 14. **The Inviolable Contract.**

In 1972, the General Assembly of Kentucky enacted K.R.S. § 61.692 which, as of the Petition Date, [12] provided, in pertinent part,

> . . . it hereby declared that in consideration of the contributions by the members and in further consideration of benefits received by the state from the member's employment, KRS 61.510 to 61.705 shall, except as provided in KRS 6.696 effective September 16, 1993, constitute an inviolable contract of the Commonwealth, and the benefits provided therein shall, except as provided in KRS 6.696, not be subject to reduction or impairment by alteration, amendment, or repeal.

The "inviolable contract" of K.R.S. § 61.692 exists between the members of KERS and the Commonwealth of Kentucky. *Jones v. Bd. of Trs. of Ky Ret. Sys.*, 910 S.W.2d 710, 711 (Ky. 1996). The inviolable contract between the members of KERS and the Commonwealth ensures the members that they will receive the retirement benefits that are promised to them at the time they begin their employment.

### 15. **Allocations from the Legislature.**

In 2010, as part of HB1 2010 Special Session, the General Assembly, through general fund appropriations, made specific allocations to the regional mental health boards in the amounts of $2,497,600 for fiscal year 2011 (2010-2011) and $3,837,800 for fiscal year 2012 (2011-2012) to assist them with the increase in employer contribution rates for the KERS non-hazardous state retirement system. The $3,837,800 then became the base level of funding for future budget allocations.

---

[12]

Effective July 1, 2013, under Senate Bill 2, KRS 61.692 was amended to distinguish between members who began to participate prior to January 1, 2014 and those who begin to participate thereafter. K.R.S. §61.692(2)(a) providing that "the General Assembly reserves the right to amend, suspend, or reduce the benefits and rights provided under KRS 61.510 to 61.705" for members who begin to participate on or after January 1, 2014 "if, in its judgment, the welfare of the Commonwealth so demands, except that the amount of benefits the member has accrued at the time of amendment, suspension, or reduction shall not be affected."

In 2012, the General Assembly appropriated the total amounts of $4,571,700 for fiscal year 2013 (2012-2013) and $5,187,500 for fiscal year 2014 (2013-2014) to assist the regional mental health boards with the increase in employer contribution rates for the KERS nonhazardous state retirement system. The base amount for future fiscal years (2015 and 2016) was thereby increased to $5,187,500.

As part of the proposed biennial budget announced in January 2014, Governor Beshear proposed an additional appropriation of approximately $19.6 million (over and above the base of $5,187,500) for fiscal years 2015 and 2016, specifically to cover the projected increase in the employer contribution rates for the mental health boards—from 26.79% to 38.77%). This proposal was adopted by the General Assembly in late March 2014 in the budget bill:

> **(4) Regional Mental Health/Mental Retardation Boards Retirement Cost Increase:** Included in the above General Fund appropriation is a total of $24,825,700 in each fiscal year for Regional Mental Health/Mental Retardation Boards to assist them with employer contributions for the Kentucky Employees Retirement System. Of that amount, $19,638,200 is to fully fund the increase in employer contribution rates in both fiscal years for those Regional Mental Health/Mental Retardation Boards that are currently participating in the Kentucky Employees Retirement System.

As a result of these special allocations from the state general fund, the actual employer contribution rate for both retirement and insurance obligations for the mental health boards which participate in KERS will be approximately 24%, while all other employers will pay 38.77% in fiscal years 2015 and 2016.

## V. <u>CONCLUSIONS OF LAW</u>

The matters before the Court, Counts I-III of KERS Complaint and Debtor's Amended Motion to Reject are "core" proceedings and within this Court's jurisdiction pursuant to 28 U.S.C. § 157(b)(2), 11 U.S.C. § 365 and 28 U.S.C. § 959(b). KERS contends that the matters asserted by

Debtor in the companion adversary proceeding 13-3014 are not "core" proceedings "in either the statutory or constitutional sense" (*see* KERS Post Trial Brief, n. 24, p. 105), and therefore this Court cannot enter a final judgment in that matter pursuant to *Stern v. Marshall*, 131 S. Ct. 2594 (2011). Adversary Proceeding 13-3014 is on appeal to the United States District Court for the Western District of Kentucky on the issue of whether KERS is entitled to sovereign immunity. The status of that proceeding was discussed at length by the parties and the Court at the hearing held on December 17, 2013. The parties agreed and the Court stated at that hearing that the Court would not undertake any action in that matter pending resolution of KERS's interlocutory appeal. (A transcript of that hearing is found at Dkt. 87 in that A.P.) Therefore, the Court will not issue a Report and Recommendation on the matters raised therein as either affirmative claims by the Debtor or defenses thereto by KERS in this Opinion.

The Court also finds that due to the Court's findings herein on Debtor's Amended Motion to Reject and Counts I through III of the Complaint in favor of Debtor, the Court has no need to consider any of the claims and defenses raised by the parties pursuant to the Employee Retirement Income Security Act of 1974 (**"ERISA"**), 29 U.S.C. § 1001, *et seq.* They are, therefore, not addressed in this Opinion.

## A.  Is Debtor a Governmental Unit and Eligible for Chapter 11 Relief?

Debtor filed its Voluntary Petition under Chapter 11 of the United States Bankruptcy Code on April 4, 2013. KERS contends in Count I of its Complaint that Debtor is not eligible for Chapter 11 relief. The general rule in civil litigation is that the moving party has the ultimate burden of proving the allegations upon which he bases his action. *In re Flick*, 14 B.R. 912 (Bankr. Pa. 1981). The Debtor, however, bears the burden of proof by the preponderance of the evidence on its

eligibility for bankruptcy relief. *In re City of Detroit, Mich.*, 504 B.R. 97 (Bankr. E.D. Mich. 2013).

The evidence presented by Debtor established that it carried its burden of proof and proved it is

entitled to be a debtor under Chapter 11.

Section 109(a) of Title 11 provides that only a "person," may be a debtor under Chapter 11.

The term "person" is defined in 11 U.S.C. § 101(41), which provides that the term includes

"individual, partnership, and corporation," but specifically excludes the term "governmental unit."

KERS contends that the Debtor is a "governmental unit" and therefore is not a "person" and not

eligible for Chapter 11 relief.

The term "governmental unit" is defined by statute, 11 U.S.C. §101(27).  It means,

United States; State; Commonwealth; District; Territory; Municipality; foreign
states; department; agency, or instrumentality of the United States . . . a State, a
Commonwealth, a District, a Territory, a municipality, or a foreign state; or other
foreign or domestic government.

The legislative history of § 101 provides that the term "governmental unit" is to be defined in the

"broadest sense."  Construing the statutory definition of "governmental unit" in its broadest sense,

the only terms within the definition that could conceivably apply to the Debtor are "department",

"agency," or "instrumentality" of the State.    However, a "department," "agency" or

"instrumentality"

does not include an entity that owes its existence to state action, such as the granting
of a charter or a license but that has no other connection with a State or local
government or the Federal Government.  The relationship must be an active one in
which the department, agency or instrumentality is actually carrying out some
governmental function.

s. rep. no. 95-989, at 24 (1978).  The evidence produced at trial does not support a finding that

Debtor is one of these entities.  Therefore, it cannot be construed as a "governmental unit."

1. **Department**.

The first rule of statutory construction is to look at the "plain meaning" of the word. *Ransom v. FIA Card Serv., N.A.*, 131 S. Ct. 716, 724 (2011). The plain meaning of "department" is "a principal branch or division of government." *Black's Law Dictionary* (9th ed. 2009). In *Kentucky Region Eight v. Commonwealth*, 507 S.W.2d 489 (Ky. 1974), Kentucky's highest court concluded that Region Eight, the predecessor to Debtor, was not an integral part of state government so as to constitute a "department." Following this decision, the Kentucky General Assembly amended K.R.S. § 61.510(3) to expand the definition of "department" to include any board participating in KERS "in accordance with appropriate executive order, as provided in K.R.S. § 61.520." K.R.S. § 61.510(3). Executive Order 79-78 was then issued to allow Debtor to participate in KERS. KERS concludes that this establishes Debtor as a "department" and therefore, a "governmental unit."

This alone, however, cannot lead to the conclusion that Debtor is a "department," for purposes of the Bankruptcy Code, simply because it was allowed to participate in KERS based on an executive order. While state law is helpful in determining the meaning of "department," it is federal law that applies to terms used in the Bankruptcy Code. *See Leefers v. Anderson (In re Leefers)*, 101 B.R. 24, 25 (C. D. Ill. 1989) ("The definition of words in federal statutes should be defined as a matter of federal law.").

The Bankruptcy Code does not define the term "department." However, "[w]hen Congress uses a familiar legal expression and does not provide a definition, that connotes Congress' intent that words be given their usual legal meaning." *In re LTV Steel Co., Inc.*, 264 B.R. 455, 473 (Bankr. N.D. Ohio 2001). "The law uses familiar legal expressions in their familiar legal sense. . .." *Henry v. United States*, 251 U.S. 393, 395 (1920). If Congress intends for courts to use a different

-53-

interpretive method to read terms in the Bankruptcy Code, courts should look to some statutory indication of this intent. *LTV Steel*, 264 B.R. at 473 (citing *United States v. Reorganized CF&I Fabrications of Utah, Inc.*, 518 U.S. 213, 221 (1996)).

The *Black's Law Dictionary* (9th ed. 2009) definition of "department" as a "principal branch or division of government," comports with federal statutory interpretation of the term in case law. For example, in *Hubbard v. United States*, 514 U.S. 695, 699 (1995), the Supreme Court interpreted 18 U.S.C. § 6 by equating the "common . . . use of 'department' to refer to a component of the Executive Branch," which includes departments such as the Department of State, the Department of the Treasury and the Department of Homeland Security. This fits with the Bankruptcy Code's use of the term "department" which is used in conjunction with "department of the United States, [or] a state." Kentucky's equivalent of federal departments are called "Cabinets." The Court finds this to be the plain meaning of the term as used in the Bankruptcy Code, not the restrictive, narrow term set forth in K.R.S. § 61.510(3). Debtor is not a "department" as the term is used in the Bankruptcy Code.

On this point, the Court finds the *Kentucky River Cmty. Care, Inc. v. N.L.R.B.*, 193 F.3d 444 (6th Cir. 1999), case instructive. Kentucky River Community Care, Inc. (**"KRCC"**) was a CMHC formed, operated, and regulated by the Cabinet in almost identical circumstances to that of Seven Counties and River Region. KRCC sought to resist unionization efforts by its nursing employees by claiming that it was a political subdivision and therefore not an "employer" subject to the National Labor Relations Act, 29 U.S.C. § 152(2). In other words, Kentucky River claimed to be a part of state government.

The Sixth Circuit disagreed, holding that KRCC was not a political subdivision because it was not created by the state and was not administered by individuals that are responsible to public officials or the general electorate.  The Court's ruling took into consideration that (1) KRCC was incorporated by a private person, (2) its purpose was to provide mental healthcare and services as a CMHC, (3) it bound itself to the extensive regulatory oversight of Chapter 210 of the Kentucky Revised Statutes, (4) it entered into contracts with the Cabinet to provide behavioral health services in its catchment, and (5) there was no evidence it was formed by the state as an administrative arm of the state or that it was operated by anyone responsible to public officials or the general electorate.

The Supreme Court ultimately took up the case in *Kentucky River Cmty. Care, Inc. v. N.L.R.B.*, 532 U.S. 706, 121 S. Ct. 1861, 149 L. Ed. 2d 939 (2001).  The Supreme Court granted certiorari on the Sixth Circuit's application of the National Labor Relations Act as to whether nurses were supervisors but not  on the question of whether Kentucky River was a political  subdivision.

Like KRCC, Debtor is a non-profit  corporation that operates mental health facilities pursuant to contracts with the Commonwealth, it was incorporated by Dr. Maloney, was created without government action and only after it was created was it recognized by the Cabinet as a regional mental-health board.  Debtor was not created by the Commonwealth and therefore, analogously, cannot constitute a department or administrative arm of the government.  Certainly Seven Counties is not administered by individuals that are responsible to public officials or to the general electorate.  K.R.S. § 61.510(3) does not change the essential nature of the Debtor.

A CMHC is not an integral part of state government.  *Region Eight*, 507 S.W.2d at 491. CMHCs do not appear in either Kentucky's statutory listing of departments nor in a state organizational chart.  CMHCs were not created directly by the state so as to constitute a department.

*Kentucky River*, 193 F.3d at 450.  The Court therefore holds that Seven Counties is not a "department" within the meaning of Section 101(27) of the Bankruptcy Code.

### 2. **Agency.**

The plain meaning of the term "agency" proffered by KERS is "state offices, departments, divisions, bureaus, boards and commissions."  *Black's Law Dictionary* (9th ed. 2009).  KERS contends that because Debtor is a "board" under K.R.S. Chapter 210, it is an agency of the Commonwealth.  The Court in *Kentucky Region Eight v. Comm.*, 507 S.W.2d 489 (Ky. 1974), held that CMHCs are not agencies within the meaning of K.R.S. § 61.510.  *Id.* at 491.  Kentucky's highest court described the structure and operation of Region Eight and the other CMHCs:

> The regional mental health-mental retardation boards are private nonprofit corporations organized under KRS Chapter 273 to participate in administering mental health-mental retardation programs and clinics under KRS 210.370 to 210.460.  KRS 210.370 provides that the programs and clinics may be administered by a community health board established pursuant to KRS 210.370 to 210.460 'or by a non-profit corporation.'

*Id.* at 490. The court noted:

> Statements from studies predating the enactment of KRS 210.370 to 210.460 were to the effect that **use of nonprofit corporations to implement the program was intended to be an alternative to use of direct state agencies**; that the corporations were to be treated as being separate and apart from state government in order to encourage local community support, and to qualify fully for receipt of federal grants and tax-deductible charitable donations.

*Id.* (emphasis added).  The CMHCs were "not claimed to be state agencies for any purpose other than retirement system participation," and their employees were "not under the merit system, state salary schedules, or any other state personnel regulations."  *Id.* at 491.  In sum, the Court found it "inconceivable that K.R.S.  § 61.510 could have been intended to bring into the Kentucky Employees Retirement System persons who are not considered state employees for any other

-56-

purpose." *Id.*  Rather, as used in K.R.S. § 61.510, the Court defined the phrase "state department or board or agency" to mean "departments, boards or agencies that are such integral parts of state government as to come within regular patterns of administrative organization and structure and to be subject to standard personnel policies having general application in the administration of government.'" *Id.*  Accordingly, the Court remanded the case to the Franklin County Circuit Court with instructions that KERS's complaint be dismissed.  *See id.*

KERS argues that the 1974 legislative revision of the definition of department settles the issue in the instant proceeding.  To this point, it suggests remedial legislation can change the inherent legal nature of Seven Counties.  The Court disagrees, since it is federal law that applies to terms used in the Bankruptcy Code.  *Leefers*, 101 B.R. at 25.

An "agency" is a municipality eligible for relief under Chapter 9, but not under Chapter 11. If River Region had been an "agency," it would not have been eligible to file a Chapter XI case under the Bankruptcy Act.  Later changes in the wording of the eligibility requirements for filing a Chapter 9 petition changed the term "petitioner" to "municipality," which is defined at 11 U.S.C. § 101(40), but the substance of the definition stayed the same.  *See Las Vegas Monorail*, 429 B.R. at 780-81.  If River Region was not an "agency" for purposes of the Bankruptcy Act, the same analysis applies to a CMHC under the current Bankruptcy Code.  Thus, CMHCs, such as the Debtor, are not "agencies" under the Bankruptcy Code.  Therefore, because Debtor is not an "agency" under 11 U.S.C. § 101(27), it cannot be a "governmental unit."

-57-

### 3. **<u>Instrumentality</u>**.

The last term that could conceivably apply to Debtor is "instrumentality." The plain meaning of this term as set forth in *Black's Law Dictionary* (9th ed. 2009) is both "(1) a thing used to achieve an end or purpose" or "(2) a means or agency through which a function of another entity is accomplished such as a branch of a governing body." Courts that have analyzed the term "governmental unit" within the Code have focused on the term "instrumentality." These cases find the plain meaning of "instrumentality" to be of little assistance. The cases, therefore, focus on the context and background of the term within the Bankruptcy Code.

The Court finds that the analysis in *In re Las Vegas Monorail*, 429 B.R. 770 (Bankr. D. Nev. 2010), provides the most useful guidance in determining whether an entity is an instrumentality for purposes of the Code. The *Las Vegas Monorail* decision ultimately determined that the non-profit corporation that ran the City's monorail system did not qualify as an "instrumentality of the state," nor a "municipality," and was therefore ineligible for Chapter 9 relief and entitled to seek relief under Chapter 11 of the Bankruptcy Code.

In *Las Vegas Monorail Co.,* 429 B.R. 770 (Bankr. D. Nev. 2010), the court extensively analyzed the legislative history of Chapter IX and evolving case law. The result of this analysis of the Bankruptcy Code's use of the terms "municipality" and "instrumentality" led the court to conclude that three areas of importance emerged. The first was whether the entity has any of the powers typically associated with sovereignty, such as eminent domain, the power to tax or sovereign immunity. If such powers are weakly present or do not exist, then courts examined the second area, which is whether the entity has a public purpose, and if so, the level of control exerted by the state on the entities activities in furthering the purpose. The more control over day to day operations, the

more likely the entity is an instrumentality under 11 U.S.C. § 101(40).  The third area is the effect

of the state's own designation and treatment of the entity.  *Id.* at 788.

In *Las Vegas Monorail*, the court determined that the Las Vegas Monorail Company

("LVMC") did not have traditional governmental attributes because it had no power to tax, no power

of eminent domain and no sovereign immunity.  *Id.* at 795.  Similarly, Debtor has no power to tax.

As will be discussed in greater detail later in this Opinion, the General Assembly has the power to

tax.  KY. CONST. § 171.  Chapter 210 of the Kentucky Revised Statutes observes a carefully

delineated distinction between "a community board for mental health or individuals with an

intellectual disability established pursuant to K.R.S. § 210.370 to § 210.460" and "a non-profit

corporation." K.R.S. § 210.370.  And for good reason.  The delegation of the power to levy a tax to

a private non-profit corporation in order to support its charitable mission would clearly violate the

Kentucky Constitution.  KY. CONST. § 27, 28 and 171.  While many of the statutes in Chapter 210

reference both a board and a non-profit corporation, they do so explicitly.  The community board

for mental health or individuals with an intellectual disability established pursuant to K.R.S. §

210.370 to § 210.460 would be a taxing district.  K.R.S. § 210.470.  The fact is, however, the power

is limited to simply requesting that a fiscal court impose a special ad valorem tax and Debtor does

not even have this limited right.

Next, Debtor clearly has no power of eminent domain, nor does KERS suggest that it does.

Therefore, this is not a factor.

Finally, while Debtor may have claimed it was entitled to sovereign immunity as a defense

in litigation, there has been no legal determination that Debtor is entitled to this distinguishing

feature of governmental entities.  Indeed, Seven Counties would not be accorded sovereign

immunity.  In *Comair, Inc. v. Lexington-Fayette Urban County Airport Corp.*, 295 S.W.3d 91, 99 (Ky. 2009), the Kentucky Supreme Court held "a way to begin to frame the discussion by noting that sovereign immunity should 'extend . . . to departments, boards or agencies that are such integral parts of state government as to come within regular patterns of administrative organization and structure.'" *Id.* (quoting *Kentucky Center for the Arts Corp. v. Berns*, 801 S.W.2d 327, 332 (Ky. 1990) (quoting *Region Eight v. Com.*, 507 S.W.2d at 491 (finding Region Eight was not an integral part of state government and therefore unable to participate in KERS)).

In *Comair*, the court determined that the Lexington-Fayette Urban County Airport Corporation is entitled to sovereign immunity, yet its facts are distinguishable from those of this case.  *See Comair*, 295 S.W.3d at 100-101.  The airport authority was created by a Kentucky Cabinet.  Debtor was created by Dr. Maloney, not by the Cabinet.  The Cabinet does not have power to appoint Debtor's Board of Directors.  Debtor is not an alter ego of the Cabinet.  Debtor is not a legislative body.  Debtor is not an "integral part of state government as to come within regular patterns of administrative organization and structure." *Berns*, 801 S.W.2d at 332; *Region Eight*, 507 S.W.2d at 491; *See also*, *Louisville Arena Authority, Inc. v. RAM Engineering & Const., Inc.*, 415 S.W.3d 671 (Ky. App. 2013) (holding that Louisville Arena Authority, a non-profit  corporation, created by executive order for the purpose of overseeing development of multi-purpose sports and entertainment venue was not performing an integral governmental function entitling it to immunity).  Debtor is not entitled to sovereign immunity.  Debtor therefore does not meet the first factor of the test in *Las Vegas Monorail*.

The second factor is the extent to which the state controls the entity's operations.  In *Las Vegas Monorail*, the governor had the power to approve LVMC's fares, approve its budget and

appoint its directors, but the state did not control LVMC's day to day operations. The court characterized the state's control as "low level" over those matters going to essential state sovereignty in state functions. The court likened the state's control of LVMC to be more like traditional regulation and not designed to protect public finances or the public fisc. The court stated,

> The Governor's control, then, while extensive, is not the type of control that historically has caused courts to label entities or enterprises instrumentalities of the State. Indeed, given the thrust and mission of LVMC to be independent of the State and its sources of tax revenues, it is best seen as an entity engaged in a public purpose, not an instrumentality carrying out a public function.

*Las Vegas Monorail*, 429 B.R. at 798.

The great weight of evidence presented to the Court at the preliminary injunction hearing and the trial herein established that the Commonwealth and the Governor have less control over Debtor's day to day operations than Nevada had over LVMC. The following facts are conclusive on this point:

(1) Debtor is a private non-profit corporation formed under Chapter 273 of Kentucky's Revised Statutes. Debtor complies with Chapter 210 of the Kentucky Revised Statutes and associated administrative regulations, but as was repeatedly testified to by Debtor's witnesses, this is so because Debtor wants to operate as a local mental health mental retardation board and keep in compliance with the requirements of its main customer, the Commonwealth.

(2) Neither the Governor nor any other agent or representative of the Commonwealth of Kentucky appoints or approves Seven Counties' Board of Directors.

(3) The Commonwealth of Kentucky also does not appoint or approve Seven Counties' officers, executives, or other employees, none of whom is an employee of the Commonwealth, and

-61-

all of whom serve at the pleasure of Seven Counties' Board of Directors.  Seven Counties' employees are not and have never been state merit system employees.

(4) The Commonwealth of Kentucky has designated Seven Counties as the authorized provider of services for its region, and Seven Counties is therefore eligible to contract  with the Commonwealth of Kentucky to provide services and receive state and federal funds for  doing so. To provide more services to the community, Seven Counties applied for and received  recognition by the Cabinet as the CMHC providing mental health services for this seven-county  region. With that designation came the opportunity to apply for millions more in contracts and  grants. The grants are capped at 50% of various operational expenditures  and may not be used for capital expenditures. K.R.S. § 210.420(1).

KERS emphasizes that the Commonwealth and the Cabinet require Seven Counties to submit a budget for how it plans on spending the grants and require the board to be reasonably representative of the community.  *See* K.R.S. § 210.430. These restrictions provide the Cabinet with assurances that the grants will be spent on services to the community, but it is not unusual  for governments to impose conditions on their appropriations. *See, e.g. Agency for Intern.  Development v. Alliance for Open Society Intern., Inc.*, __ U.S. ___, 133 S. Ct. 2321, 2327  (2013); *Rust v. Sullivan*, 500 U.S. 173, 195, n. 4 (1991) ("Congress' power to allocate funds for public purposes includes an ancillary power to  ensure that those funds are properly applied to the prescribed use."); and *Hager v. Kentucky Children's Home  Society*, 119 Ky. 235, 83 S.W. 605 (Ky. 1904).

(5) All of the funds that Seven Counties receives from the Commonwealth come through contracts and modifications thereto, and the Commonwealth does not directly appropriate any funds to Seven Counties.  For purposes of an instrumentality analysis, it is operational control that matters,

and the evidence here conclusively establishes lack of state control over Debtor's operations.  As expressly noted in *Las Vegas Monorail*, "a limited measure of public control, regulation or oversight simply does not, by itself, make an entity a public agency. Otherwise, heavily regulated industries, such as casinos and taxi cabs, would be municipalities."  *Las Vegas Monorail*, 429 B.R. at 786.

(6)  The Commonwealth of Kentucky, specifically the Secretary of the Cabinet, possesses the power to remove recognition of Seven Counties as the recognized provider under the applicable statutory scheme, a power referred to at trial as the ability to "de-designate." This action would bar Seven Counties from procuring or bidding for the state contracts through which it receives the majority of its funds. The act of de-designation, however, would have no effect on Seven Counties' continued corporate existence.

(7) The Cabinet's liaison, Lou Kurtz, forthrightly testified that his role at Seven Counties' Board meetings is primarily to observe and report, and that he does not profess to exercise any authority over these proceedings. Indeed, Mr. Kurtz admits that he is regularly barred from executive session, and is subject to the Board's request that he absent himself altogether, as occurred at a recent meeting.

(8) KERS presented no evidence that the Cabinet or any other state agency has the ability to seize or exercise dominion over any property belonging to Seven Counties. To the contrary, in the event Seven Counties were to liquidate or wind up its operations, Seven Counties' Bylaws, of which multiple iterations are in evidence, mandate that its assets will not escheat or revert to the state, but will instead go to another non-profit corporation organized under K.R.S. Chapter 273. Debtor's Board would have the authority to make such authorized conveyance.

-63-

(9) At the hearing on KERS's request for a preliminary injunction, Seven Counties presented substantial evidence regarding several parcels of real property, which are held in its own corporate name, and many of which are unencumbered. To the extent Seven Counties has granted a mortgage on several parcels of its real estate, Seven Counties is solely responsible for repayment. No evidence has been presented to suggest that the Commonwealth of Kentucky or any of its branches owns any interest in these parcels, or otherwise controls them or would pay off the indebtedness on those parcels. KERS admits that in the event of liquidation, Seven Counties will be able to use any equity in this privately-held property to satisfy the claims of its creditors.

(10) Seven Counties does not possess the power to levy a tax. *See* discussion above.

(11) Seven Counties has never been adjudged to enjoy sovereign immunity, and applicable case law would suggest that it does not. *See* discussion above.

As in *Las Vegas Monorail*, Seven Counties is incorporated under the Commonwealth's non-profit corporation law. Debtor's funds do not come from any taxation or direct allocation, but instead from the services it provides to patients and the Cabinet, as set forth in contracts negotiated at arms-length. While KERS has demonstrated that the Cabinet has substantial oversight of Seven Counties, this oversight is not as extensive as in *Las Vegas Monorail*. Unlike in *Las Vegas Monorail*, for instance, neither Kentucky's Governor nor the Cabinet has the power to appoint any board member or even to participate in Seven Counties board. Seven Counties does not require approval from the Cabinet for its fees for services. The day-to-day operations in both cases are within the sole purview of the corporation's board of directors, officers, and employees, without any direct control from any state official.

In Count I of KERS's Complaint, it seeks an order declaring that Debtor is a "governmental unit," under 11 U.S.C. § 101(27). In Count II, KERS seeks an order dismissing Debtor's Chapter 11 Petition because Debtor is ineligible to be a Debtor under Chapter 11 pursuant to 11 U.S.C. § 109(a), (b), and (d). The findings by the Court herein will not support the relief requested by KERS in Counts I and II of the Complaint. The extensive factual findings lead to the conclusion that Debtor is not a "governmental unit" under 11 U.S.C. § 101(27). The evidence demonstrates that Debtor is a "person" as defined in 11 U.S.C. § 101(41). Therefore, Debtor is eligible to be a "debtor" as that term is defined in 11 U.S.C. § 109(a) and is entitled to seek relief under Chapter 11 of the United States Bankruptcy Code. Therefore, Judgment will be entered in favor of Debtor and against KERS on Counts I and II of the Complaint.

### 4. <u>Count III - Injunctive Relief to Compel Seven Counties to Comply with Statutory Obligations</u>.

Count III of KERS's Complaint was originally brought as a Motion to Compel Debtor to comply with what KERS calls "Debtor's Statutory Obligations" under Kentucky law. In Count III, KERS seeks a permanent injunction requiring Debtor to make all reports to KERS, to withhold all employee "pick up" deductions, and to make all regularly scheduled employee and employer contributions to KERS, as required by K.A.R. Title 105 pursuant to 28 U.S.C. § 959(b) and 11 U.S.C. § 363(d)(1). For the following reasons, KERS is not entitled to Judgment in its favor on Count III of the Complaint.

In addition to Count III of KERS's Complaint, Debtor's Amended Motion to Reject a Potentially Executory Contract is also before the Court. These distinct legal issues must be addressed together by virtue of the relief sought by KERS and its argument that 28 U.S.C. § 959(b) supercedes a debtor's power to reject an executory contract.

-65-

### (a) <u>11 U.S.C. § 363(d)(1)</u>.

The Court first addresses KERS's argument that 11 U.S.C. § 363(d)(1) requires Debtor to continue participating in the System. Section 363(d)(1) limits the right of trustees of certain non-profit entities to use, sell and convey the assets of the non-profit. Section 363(d)(1) was added in the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 as was a companion provision, section 541(f). The purpose was "to restrict the use, sale or lease of a non-profit entity's property except in accordance with applicable nonbankruptcy law, so that a non-profit entity cannot escape supervision by its state's Attorney General, who is given standing to appear and be heard on this issue." 3 COLLIER ON BANKRUPTCY ¶ 363.04 (Alan N. Resnick & Henry J. Sommers eds., 16th ed). *See also* H. R. Rep. 109-31 (BAPCA 2005) § 363(d)(1) and § 541(f). The legislative history of the statute makes clear that the nonbankruptcy law restrictions in the statute do not impair this Court's jurisdiction to apply those laws in a particular case or defer to another forum. *Id.* The statute is designed to make sure a trustee does not violate state law such as K.R.S. § 273.303.

Seven Counties has not proposed a plan of dissolution or liquidation of its assets, nor has it proposed to sell or use assets in contravention of K.R.S. Chapter 273 governing non-profit entities. The Court does not agree with KERS that § 363(d)(1) compels the Court to require Debtor to remain in the System. Accordingly, the Court finds no basis to grant Judgment in KERS's favor on Count III under 11 U.S.C. § 363(d)(1).

### (b) <u>28 U.S.C. § 959(b)</u>.

The Court next turns to KERS's argument that 28 U.S.C. § 959(b) requires this Court to order Seven Counties to continue participation in the System.

28 U.S.C. § 959(b) provides, in pertinent part that

-66-

> (b) . . ., a trustee, receiver or manager appointed in any cause pending in any court of the United States, including the debtor-in-possession, shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor would be bound to do if in possession thereof.

A plain reading of this statute indicates it is focused on requiring a debtor to manage and operate property post-petition per valid state laws where the property is located.  To read into this statute a requirement that Seven Counties must continue to participate in the System and pay the "statutorily required employer contribution" requires a huge leap of analytical faith.  This stretch is best viewed by the cases cited by KERS.

KERS cites a variety of cases involving police powers, all of which correctly invoke section 959 because they relate to management and operation of property, but none of which is relevant here.  KERS is correct that courts may continue to require an estate to protect the environment against toxic pollution. *See, e.g., id.*; *Cumberland Farms, Inc. v. Florida Dep't of Envtl. Prot.*,  116 F.3d 16 (1st Cir. 1997); *Lancaster v. Tennessee (In re Wall Tube & Metal Products Co.)*, 831 F.2d 118 (6th Cir. 1987).  Courts may also require compliance with local zoning requirements, *Lawson v. Town of Sardinia (In re Chafee Aggregates, Inc.*, 300 B.R. 170, 172 (Bankr. W.D. N.Y. 2003); housing codes, *Saravia v. 1736 18th St. N.W. Ltd. Partnership*, 844 F.2d 823, 826-7 (D.C. Cir. 1988);  and liquor licensing, *Go West Entertainment v. New York State Liquor Authority* (*In re Go West Entertainment, Inc.)*, 387 B.R. 435, 445  (Bankr. S.D. N.Y. 2008).  All of these areas are ones in which the states have broad police powers.  None of these relate to employee benefit plans.  Employee benefit plans are not part of  the state police power to protect public health and safety.  Chapter 61 of the Kentucky Revised Statutes governs the relationship between a participating employer and KERS, which manages the state retirement system for the Commonwealth.  This

dispute is not about KERS attempting to enforce statutes that protect the health and safety of the general public.  KERS simply seeks to force Seven Counties to pay into the System.

If state law is contrary to the distribution provisions of federal bankruptcy law, state law must yield.  *Saravia v. 1736 18th Street N.W., L.P.*, 844 F.2d 823, 826 (D.C. Cir. 1988) (citing *Perez v. Campbell*, 402 U.S. 637, 649 (1971)) .  Under the Supremacy Clause of Article VI of the United States Constitution, it is well settled that if enforcement of a state law or regulation would conflict with the purposes and objectives of Congress in enacting a federal statute, the conflict must be resolved in favor of federal law.  *In re Smith-Douglass, Inc.*, 856 F.2d 12, 15 (4th Cir. 1988) (citing *Hines v. Davidowitz*, 312 U.S. 52 (1941).

KERS argues 28 U.S.C. § 959 and K.R.S. Chapter 61 operate to foreclose Seven Counties' right to reject its relationship with KERS as a contract under § 365.  This proposition is incorrect as will be discussed.  "[S]tate law protections cannot be used to negate the Debtor's rejection powers under § 365. 'The requirement  that the debtor in possession continues to operate *according* to state law requirements imposed on the debtor in  possession (*i.e.* § 959(b)) does not imply that its powers under the Code are *subject* to the state  law protections.'"  *In re Old Carco LLC*, 406 B.R. 180, 212 n. 32 (Bankr. S.D. N.Y. 2009) (quoting *In re PSA., Inc.*, 335 B.R. 580, 587 (Bankr. D.Del.  2005) (emphasis in original));   "Congress enacted [§] 365 to provide debtors the authority to reject executory contracts. This  authority preempts state law by virtue of the Supremacy Clause [and] the Bankruptcy Clause."  *Old Carco*, 406 B.R. at 205 (quoting *In re City of Vallejo*, 403 B.R. 72, 77 (Bankr. E.D. Cal. 2009)); *see also In re Stable Mews Associates, Inc.*, 41 B.R. 594, 600 (Bankr. S.D. N.Y. 1984) (Section 959 does not disturb the "general policy of permitting trustees to rid themselves of further  executory obligations" manifested in Section 365).

It has been stated that the power of the Debtor to reject an executory contract in bankruptcy pursuant to § 365(h) is complimentary to the provisions of 28 U.S.C. § 959(b) where "the debtor is permitted to reject private contracts under § 365(h), but is not relieved of public obligations– – especially ones going to health and safety – – under § 959(b)." *Saravia v. 1736 18th Street, N.W., Ltd. Partnership*, 844 F.2d 823 (C.A. D.C. 1988). Here, the Court is not faced with the Debtor using Chapter 11 and specifically 11 U.S.C. § 365(h) as a shield to avoid state laws regulating health and safety. What is at issue here is funding of a specific pension fund. This Court does not find this to be the equivalent of the public health and safety concerns addressed by the cases cited by KERS in support of application of § 959(b). Accordingly, the Court finds that 28 U.S.C. § 959(b) does not compel this Court to grant KERS's requested relief in Count III.

By itself, 28 U.S.C. § 959(b) is simply unpersuasive as a means to compel Seven Counties to continue participation. What is interesting is KERS's citation to cases requiring the debtor to make payment of state sales taxes held in trust and interest due on taxes. *See Texas Comptroller of Public Accounts v. Megafoods Stores, Inc. (In re Megafoods Stores, Inc.)*, 163 F.3d 1063 (9th Cir. 1998); *Matter of Al Copeland Enters., Inc.*, 991 F.2d 233 (5th Cir. 1993). Payment of taxes post-petition is governed by 28 U.S.C. §960.

### (c) **28 U.S.C. §960**.

In closing arguments, Seven Counties refers to the "statutorily required payment obligation" as a tax. KERS has been silent on this point, merely analogizing this obligation to a regulatory fee or assessment. If the employer contribution is a tax, KERS would have demanded the Debtor pay the contributions promptly, post-petition. 28 U.S.C. § 960. Yet, KERS did not. Now it argues employer contributions are a regulatory fee, and enforceable post-petition under 28 U.S.C. §959(b).

-69-

The Court disagrees with this characterization.  Early case law distinguishes a tax from a regulatory fee.

> Since a tax is a charge imposed for the purpose of raising revenue, a charge primarily imposed for the purpose of regulation is not a tax, and is not subject to the constitutional limitations upon the power of taxation. . . . If the primary purpose of the legislature in imposing such a charge is to regulate the occupation or the act, the charge is not a tax even if it produces revenue for the public.

See Commonwealth v. Louisville Atlantis Comm./Adapt, Inc., 971 S.W.2d 810, 815 (Ky. Ct. App. 1997) (quoting Gray v. Methodist Episcopal Church, 114 S.W.2d 1141, 1144 (Ky. 1938)).  The obligation at issue here is not a regulatory fee.  KERS is not Seven Counties' regulating entity. KERS is merely in the business of collecting, managing and distributing retiree benefits, and its interactions and authority regarding Seven Counties are limited simply to those tasks.  Seven Counties' regulator is an entirely different agency: the Cabinet, which regulates CMHCs through K.R.S. Chapter 210 and assesses a Health Care Providers Tax of up to 4% of gross revenues as part of its regulatory function.  See K.R.S. § 142.314(1).

Fundamentally, and as discussed earlier in connection with 28 U.S.C. § 959, Seven Counties' contributions to KERS do not constitute a fee imposed under the state's police powers.  Employer contributions are strictly financial obligations designed to provide deferred compensation to Seven Counties' employees via the KERS system, or as the System is a cost sharing multi-employer defined benefit plan, to provide funding for a state retirement system.  As there is no actuarial accounting for employer contributions, these funds simply provide funding for the commingled trust corpus.  This cannot be a regulatory scheme for the public's health, safety and welfare.

Nor can Seven Counties' obligations be construed as "assessments" under Kentucky law. Assessments are payments for a direct benefit, such as sewer access, or for an improvement made

by a state or territorial subdivision that may be properly considered to improve the general conditions of health and comfort in an area. *See Long Run Baptist Assoc., Inc. v. Louisville and Jefferson County Metropolitan Sewer District*, 775 S.W.2d 520 (Ky. Ct. App. 1989) (citing *Dickson v. Jefferson County Bd. of Ed.*, 225 S.W.2d 672 ( Ky. Ct. App. 1952)).

The Court will refrain from construing Seven Counties' obligation as a tax under 28 U.S.C. § 960, even though in some respects it fits this category more appropriately given the cost-sharing nature of the defined benefit plan. Again, the design of the System requires the Commonwealth to pay all retirement benefits to participating members because the System is a state retirement plan, the Commonwealth is the primary obligor under the inviolable contract, and private business participation in the System simply cannot be guaranteed in perpetuity. Nevertheless, the "statutorily required employer obligations" cannot be a tax because any such tax would be in direct conflict with numerous sections of the Kentucky Constitution.

### (d) <u>Various Constitutional Issues</u>.

Perhaps the most obvious constitutional problem with such a construction would be the fact that Seven Counties is a non-profit charitable organization, exempt from federal, state and local taxation. Because non-profits devote all of their income to direct costs of maintenance, they are protected from taxation under Section 170 of the Kentucky Constitution and Section 501(c)(3) of Title 26 of the United States Code. *See Gray v. Methodist Episcopal Church*, 114 S.W.2d 1141, 1143 (Ky. 1938).

If the obligation is a revenue raising device and therefore a tax, it is to be levied by the General Assembly and "shall be uniform upon all property of the same class subject to taxation within the territorial limits of the authority levying the tax, and all taxes shall be levied and collected

-71-

by general laws." KY. CONST. § 171.  *See also Commonwealth v. Louisville Atlantis Cmty.*, 971 S.W.2d at 815.  Here, Seven Counties' obligation arose in 1979 when Seven Counties--one particular entity--requested to join KERS and was admitted into the System.  KERS argues that once admitted, Seven Counties cannot exit the System, thus providing a perpetual stream of employer contributions.  It is one thing for the General Assembly to make provisions to raise revenue uniformly upon all property of the same class and by general law.  Here, however, most CMHCs but not all Kentucky non-profit corporations, nor all Kentucky corporations involved in contracts with the state, were admitted into the System.  *See also St. Luke Hospital, Inc. v. Health Policy Bd.*, 913 S.W.2d 1, 3 (Ky. Ct. App. 1996).

And the problems with construing Seven Counties obligations as a tax do not end there.  "Taxing laws should be plain and precise, for they impose a burden upon the people.  That imposition should be explicitly and distinctly revealed."  *See George v. Scent*, 346 S.W.2d 784,789 (Ky. Ct. App. 1961).  The statutes imposing obligations on Seven Counties never mention taxation.  The very fact that the Court must now inquire into the nature of Seven Counties' obligations (for which there is no provision for exit from the System) coupled with KERS's demand that this Court compel its continued participation, demonstrates that no tax has been plainly and precisely imposed.

Moreover the General Assembly did not appropriately delegate to the governor the authority to impose a tax by designating Seven Counties as an employer in the System.  The Kentucky Constitution is well-known for its explicit provisions that mandate a  separation of powers among the three branches of government.  *See* KY. CONST. § 27.  Further, the Kentucky Constitution specifically prohibits an incursion of one branch of government into the powers and functions of others.  *See* KY. CONST. § 28.  *See also Beshear v. Haydon Bridge Co., Inc.*, 416 S.W.3d 280, 295

(Ky. 2013). While the General Assembly may delegate some of its power to the executive so that the laws it passes can be implemented, delegation to the executive branch of what appears to be a legislative function must be limited by specific criteria governing the exercise of the delegation. KY. CONST. § 60. *See Legislative Research Comm. v. Brown*, 664 S.W.2d 907, 915 (Ky. 1984) (citing *Holsclaw v. Stephens*, 507 SW.2d 462 (Ky. Ct. App. 1974)).

The 1974 amendment of K.R.S. § 510(3) permitted the governor to admit into the System basically anyone he chose to designate as a "department," "notwithstanding whether said body, entity, or instrumentality is an integral part of state government." This was a vast delegation of authority to the governor to extend Kentucky's inviolable contract for retirement benefits.

When possible, the Court will construe statutes to be constitutional. *Eubanks v. Wilkinson*, 937 F.2d 1118, 1122 (6th Cir. 1991) ("Courts construe statutes to avoid constitutional difficulty when 'fairly possible.' " (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932))). The Court is convinced that the obligations at issue here cannot be construed as regulatory fees, assessments, or taxation and therefore cannot be compelled by KERS without a violation of any number of Sections of the Kentucky Constitution. To resolve the anomaly presented, the Court concludes the obligation must be contractual in nature. The Court will proceed to examine whether or not a contract existed between Seven Counties and KERS and whether or not this contract is an executory contract that can be rejected under 11 U.S.C. § 365.

### 5. <u>Amended Motion to Reject</u>.

Seven Counties argues an executory contract exists between the Debtor and KERS and that it may be rejected pursuant to 11 U.S.C. § 365. Two steps are required in this analysis. First, the

Court must determine if the Debtor and KERS entered into a contract under Kentucky law.  If they have, then the Court must decide if that contract is executory under federal law.

### (a)  The Contract Between the Debtor and KERS.

Whether or not a contract exists between the Debtor and KERS is a matter of state law.  *See Butner v. United States*, 440 U.S. 48, 54 (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law.").  In Kentucky, "[t]he elements of a contract are: offer and acceptance, full and complete terms, and consideration."  *Collins v. Kentucky Lottery Corp.*, 399 S.W.3d 449, 455 (Ky. Ct. App. 2012) (citing *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.,* 94 S.W.3d 381, 384 (Ky. Ct. App. 2002)).[13]  An examination of the arrangement between the Debtor and KERS demonstrates that all three of the elements of contract existed between the two parties, and that therefore a valid contract was entered into under Kentucky law.

First, a look back to the beginnings of the arrangement between the Debtor and KERS evidences the occurrence of both offer and acceptance.  The Debtor offered to make employer contributions and employee "pick ups" to KERS in exchange for pension coverage for its employees.  An offer is defined as "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it."  *United States v. Hardy*, 916 F. Supp. 1373, 1380 (W.D. Ky. 1995) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 24 (1981)).

---

[13]

The Kentucky Revised Statutes provides its own broad, yet somewhat unhelpful, definition: " 'Contract' means all types of state agreements . . . ."  K.R.S. § 45A.030(7).

Counsel for the Board of Directors of Seven Counties sent a letter to the Kentucky Attorney General asking whether Seven Counties might be eligible to participate in KERS.  The Attorney General responded with an opinion,  Ky. O.A.G. 78-685, issued on October 4, 1978, in which he stated that Seven Counties could participate in KERS.  Consequently, in 1979 Seven Counties' Board of Directors requested that an executive order be issued that would bring Seven Counties into KERS.  The Board's request that the Debtor be brought into KERS constituted a manifestation of the Debtor's willingness to enter into a bargain with KERS--that is, to provide KERS's required contributions in exchange for the provision of pension benefits to the Debtor's employees.  This request invited the assent of the Commonwealth of Kentucky's executive branch, of which KERS is a part, to the Debtor's participation in KERS and communicated that the executive branch's assent would conclude the bargain.

Acceptance of the Debtor's offer followed shortly thereafter, on January 24, 1979. Acceptance is defined as "a manifestation of assent to the terms thereof made by the offeree in a manner invited or required by the offer."  *Id.* at 1381 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 50 (1981)).  "[A]n acceptance must comply exactly with the requirements of the offer, omitting nothing from the promise or performance requested."  *Id.*  (quoting *Venters v. Stewart*, 261 S.W.2d 444, 446 (Ky. 1953)).  Here, KERS manifested its assent to the Debtor's proposal when Governor Carroll issued Executive Order 79-78.  This Order referenced the Debtor's offer, stating that the Board of Directors of the Debtor "requested that an Executive Order be issued" that would bring the Debtor into KERS.  **(Executive Order 79-78).**  The Order then responded to the Debtor's request by designating Seven Counties "as a participating department in the Kentucky Employees Retirement System."   With this Executive Order, the Commonwealth of Kentucky's executive

-75-

branch, of which KERS is a part, agreed to the exact proposal made by the Debtor- -that the Debtor enter into KERS and make contributions in exchange for employee pension coverage.

The arrangement between the Debtor and KERS also contained the second element of a Kentucky contract: full and complete terms.  For the terms of a contract to be full and complete "they must be 'definite and certain' and must set forth the 'promises of performance to be rendered by each party.' " *Energy Home Div. of Southern Energy Homes, Inc. v. Peay*, 406 S.W.3d 828, 834 (Ky. 2013) (quoting *Kovacs v. Freeman*, 957 S.W.2d 251, 254 (Ky. 1997)).  An agreement "need not cover every conceivable term of the relationship" but "must set forth the 'essential terms' of the deal." *Quadrille Bus. Syst. v. Ky. Cattleman's Assoc., Inc.*, 242 S.W.3d 359, 364 (Ky. Ct. App. 2007) (quoting *Auto Channel Inc. v. Speedvision Network LLC*, 144 F. Supp. 2d 784, 790 (W.D. Ky. 2001)).  Here, the terms of the arrangement proposed by the Debtor in 1979 were full and complete.

Voluminous and detailed arrangements regarding the contributions to be made by the Debtor and the pension management services to be provided by KERS existed, and still exist, in the Kentucky Statutes and Regulations governing the System.  These statutes and regulations cover, among other things: the calculations used to determine the Debtor's and its employees' contributions, the procedures employed by KERS in paying out pensions to retired employees, and the duties assumed by KERS in managing pension funds.  There is no question that the parties contemplated the application of these terms when they struck their bargain.[14]

Finally, both parties received consideration.

---

[14] The mere fact that KERS enjoyed the power to change certain terms, such as by raising the Debtor's contribution rate, does not militate against the conclusion that the terms here were definite and certain.  A contract is no less a contract simply because certain terms are variable or subject to condition.  Contracts with variable terms, such as variable rate mortgages, abound in the commercial world, and parties strike bargains with such terms knowing full well that a certain price, interest rate, or percentage may be subject to change.

> Consideration is defined as a benefit conferred to a promisor or a detriment incurred
> by a promisee. A benefit occurs when the promisor, in exchange for a promise,
> obtains a legal right to which he was not otherwise entitled. A detriment occurs
> when the promisee, in exchange for the promise, waives a right to which he was
> otherwise entitled to exercise.

*Martin v. Pack's Inc*., 358 S.W.3d 481, 484 (Ky. Ct. App. 2011) (citing *Huff Contracting v. Sark*,

12 S.W.3d 704, 707 (Ky. Ct. App. 2000)). Furthermore, it is established that a benefit may occur

when a promisor, in exchange for a promise, obtains a legal right for a third person. RESTATEMENT

(SECOND) OF CONTRACTS § 71(4) (1981) ("The performance or return promise may be given to the

promisor or to some other person."). Here, both parties clearly incurred detriments and were

conferred benefits in exchange. The Debtor incurred a detriment: liability for employer

contributions. In exchange, the Debtor was conferred a benefit: pension coverage for its employees.

Likewise, KERS incurred a detriment: the obligation to manage pension funds and pay out benefits

to retirees. And in exchange, KERS was conferred a benefit: contributions from the Debtor. Just

as in any other contract, each side bargained for something it wanted and paid a price in exchange.

Offer and acceptance, definite terms, and consideration were all present in the agreement

between the Debtor and KERS. The parties voluntarily entered into a bargain that seemed beneficial

to each: the Debtor could attract and retain employees by offering them a KERS pension, and KERS

could obtain contributions that improved the actuarial position of the state pension fund as a whole.

Because all three elements of a contract under Kentucky law were present in the arrangement

between the Debtor and KERS, that arrangement is a contract under 11 U.S.C. § 365.

KERS objects to the characterization of the Debtor's arrangement with KERS as a contract.

KERS's arguments against the existence of a contract here are largely based on the idea that it is

somehow impossible to enter into a contract where acceptance is effectuated via executive order and

contractual terms are found in statutory text.  KERS offers no citations to any authority for this position, instead relying on inapposite cases standing for the quite distinct proposition that judicial orders reducing contractual debts to judgment do not create executory obligations.  (Pl.s Findings of Fact and Conclusion of Law, at 111 (citing *Chattanooga Memorial Park v. Still* (*In re Jolly*), 574 F.2d 349, 351-52 (6th Cir. 1978) ; *Roxse Homes v. Roxse Homes Ltd. P'ship*, 83 B.R. 185, 187-88 (D. Mass. 1986), *aff'd w/o opinion*, 860 F.2d 1072 (1st Cir. 1988); *In re Giordano*, 446 B.R. 744, 749 (Bankr. E.D. Va. 2010))).  Fundamentally, pension plans like the one at issue in this case are formed from a triangular structure built from three contracts: a contract between worker and employer, worker and pension fund, and pension fund and employer.  The pension fund, here KERS, has an agreement with covered workers to provide coverage as well as an agreement with the Debtor as a participating employer.  The fact that the terms of these agreements are provided by statute does not change this reality.[15]

KERS also argues that its arrangement with the Debtor cannot be a contract because, according to KERS, contracts with the Commonwealth must be in writing under K.R.S. § 45A.245(1).  The Court disagrees.  Section 45A.245(a) waives Kentucky's sovereign immunity for breach of contract claims from parties "having a lawfully authorized written contract . . . ."  K.R.S. § 45A.245(1).  It is apparent, without deciding whether the agreement here is a "lawfully authorized written contract" under § 45A.245(1), that this sovereign immunity statute does not control the issue

---

[15]

Indeed, KERS's obligations to the covered workers are explicitly recognized as contractual in the KERS statute. K.R.S. § 61.692.  Similarly, the law of other states recognizes the existence of contracts between participating employers and public pension plans.  *See, e.g., Arya v. CALPERS*, 943 F. Supp. 2d 1062, 1066 n.1 (E.D. Cal. 2013) (stating that employer "contracted with defendant CalPERS to manage retirement benefits" for its employees); *Jordan v. Kirkman*, No. CV 07-06575, 2008 WL 4601297 at *1 n.3 (C.D. Cal. Oct. 15, 2008) (same); *Orlandi v. Penn. Mun. Retirement Bd.*, No. 2355 C.D. 2011, 2012 WL 8704640 at *2 (Pa. Commw. Ct. Oct. 11, 2012) (describing pension plan as contract between employer and municipal retirement board).

of whether or not a contract exists between the Debtor and KERS. The Debtor is not bringing a breach of contract action for damages against the Commonwealth. Furthermore, parties can have contracts with the Commonwealth, and may be entitled to certain forms of relief, even in the absence of a written contract under § 45A.245(a). *See Newton v. Univ. of Louisville,* 2009-CA-002197-MR, 2010 WL 4366360 at *4 (Ky. Ct. App. Nov. 5, 2010) (unpublished) (finding implied contract with state); *Stathis v. University of Kentucky*, 2004 CA-000556-MR, 2005 WL 1125240 at *9 (Ky. Ct. App. May 13, 2005) (unpublished) (same).

It should also be noted that, though KERS objects to the characterization of the arrangement here as a contract, it fails to offer any valid alternative theory for what the arrangement would otherwise be. KERS styles the Debtor's obligation under the KERS statutes as a regulatory assessment or regulatory fee, but, as described above, these characterizations are contrary to Kentucky law. Nor would Kentucky law permit a characterization of the Debtor's obligation as a tax. The only way to construe the Debtor's obligations under the KERS statutes that is in conformity with Kentucky law is to construe them as contractual obligations, freely entered into, with bargained for consideration.

### (b)  The Debtor-KERS Contract is Executory Under 11 U.S.C. § 365.

The Bankruptcy Code does not define the term "executory contract." One frequently cited definition is Professor Countryman's description (the "Countryman test") of an executory contract as "a contract under which the obligations of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." *Chattanooga Memorial Park v. Still* (*In re Jolly*), 574 F.2d 349, 350-51 (6th Cir. 1978) (quoting Vern Countryman, *Executory Contracts in*

-79-

*Bankruptcy: Part I*, 57 MINN. L. REV. 439, 460 (1973)). For its part, the Sixth Circuit Court of Appeals has described executory contracts as agreements "that involve obligations which continue into the future," including "leases, employment contracts, and agreements to buy or sell in the future." *Id.* at 351 (citing S. Rep. No. 94-458, 94ᵗʰ Congress, 1st Sess. (1995)). "Generally, they are agreements which include an obligation for the debtor to do something in the future." *Id.*

But the Sixth Circuit does not follow any single definition blindly. According to the Sixth Circuit's seminal *Jolly* case, "[s]uch definitions are helpful, but do not resolve this problem." *Id.* In *Jolly*, the Sixth Circuit enunciated a functional approach to the executoriness question in cases where a debtor seeks to reject a burdensome contract:

> The key, it seems, to deciphering the meaning of the executory contract rejection provisions, is to work backward, proceeding from an examination of the purposes rejection is expected to accomplish. If those objectives have already been accomplished, or if they can't be accomplished through rejection, then the contract is not executory within the meaning of the Bankruptcy Act.

*Jolly*, 574 F.2d at 351. Importantly, "[a] court may find a contract is executory under the functional approach even though it might not have found the contract to be executory under the Countryman test." *Phar-Mor, Inc. v. Strouss Bldg. Assocs.*, 204 B.R. 948, 952 (N.D. Ohio 1997) (citing to other cases).

Following this functional approach to the executory contract question, "[t]he ultimate purpose behind section 365 is 'to allow a trustee to pick and choose among the debtor's agreements and assume those which benefit the estate and reject those which do not.' " *Id.* (quoting *In re G-N Partners*, 48 B.R. 462, 465 (Bankr. D. Minn. 1985)). Working backwards, then, the Court must answer two questions to resolve the executoriness issue: (1) Does the debtor have material unfulfilled obligations extending into the future? and (2) might rejection of the contract reasonably

benefit the estate?  *See id.*  If the court answers both questions in the affirmative, the contract is

executory and can be rejected under 11 U.S.C. § 365.

Here the answer to both questions is clearly yes.  Seven Counties has the continuing future

obligation to make contributions to KERS, and rejection of the contract will benefit the estate by

allowing the Debtor to escape these payment obligations, obligations that have become impossible

and will result in termination of its operations.  Furthermore, given the devastating impact of these

obligations on the Debtor's ability to operate, it is well within Seven Counties' sound business

judgment to reject its contract with KERS.

KERS argues that the contract here cannot be executory because KERS does not owe any

continuing obligations, that the contract fails the Countryman test, and that to describe the contract

as executory would make section 365 "utterly limitless" and applicable to "every obligation of a

debtor."  None of these arguments is persuasive.  Whether or not KERS owes continuing obligations

to Seven Counties, and whether or not the contract here would be executory under the Countryman

test, the law in this circuit is *Jolly*.  In situations of rejection, *Jolly* allows contracts to be defined as

executory under the functional approach described above; there is no requirement that the contract

adhere to the Countryman test or any other formula predicated on finding particular continuing

obligations on the part of the non-debtor party.  To follow the functional approach is merely to apply

the governing law in this circuit.  Whether under the functional approach or the Countryman test,

the Court will not force the Debtor to perform ruinous continuing obligations.  Nevertheless, the

Court finds that KERS does owe all participating employers continuing obligations by way of the

management of the System.  Those obligations are plainly stated throughout the KRS Employer

Reporting Manual.  (Defendant's Exhibit 280, Preliminary Injunction Binder 1, Exhibit 8).

Fundamentally, KERS's position is that the Debtor's contractual obligations must remain untouched by the bankruptcy process because those obligations are mandated by state statute. But "state law cannot reorder the distributional priorities of the bankruptcy code." *In re City of Detroit Mich.*, 504 B.R. 191, 255 (Bankr. E.D. Mich. 2013). As has recently been stated in the context of a Chapter 9 case, "no state law can protect contractual pension rights from impairment in bankruptcy, just as no law could protect any other types of contract rights." *Id.*[16] And if debtors in Chapter 9, a more limited chapter of Title 11, can escape pension liabilities in bankruptcy, it would be illogical for a Chapter 11 debtor to not have the same remedy. Bankruptcy law is federal and uniform, and the impairment of contractual obligations is its most important feature; a part of its very nature. The Court will allow Seven Counties to exercise its rights under 11 U.S.C. § 365 and reject this contract.

## VI. <u>CONCLUSION</u>

For all of the above reasons, the Court will enter the attached Judgment finding in favor of the Debtor on Counts I-III of KERS's Complaint and dismiss KERS's Complaint. Seven Counties is entitled to seek Chapter 11 relief. As part of that relief, Debtor is entitled to reject its executory contract with KERS in its sound business judgment. A separate Order granting Debtor's Amended Motion to Reject is attached hereto.

The issue of Debtor's eligibility was initially raised through KERS's Motion to Dismiss the Chapter 11 case, but the parties proceeded with this adversary proceeding at the Court's direction. The ruling herein on Debtor's eligibility is a preliminary matter in this bankruptcy case. Debtor's

---

[16] Private employers in Chapter 11, of course, do not need the state's consent to file for bankruptcy.

ultimate objective is confirmation of a plan. The Court assumes the Debtor will proceed toward that objective.

Joan A. Lloyd
United States Bankruptcy Judge

Dated: May 30, 2014

## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF KENTUCKY
## LOUISVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| SEVEN COUNTIES SERVICES, INC. | ) | CASE NO. 13-31442(1)(11) |
| | ) | |
| _____Debtor_____ | ) | |
| | ) | |
| KENTUCKY EMPLOYEES RETIREMENT SYSTEM | ) ) | AP No. 13-03019 |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SEVEN COUNTIES SERVICES, INC. | ) | |
| | ) | |
| _____Defendants_____ | ) | |

## ORDER

Pursuant to the Memorandum Opinion entered this date and incorporated herein by reference,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that the Amended Motion

for Approval of Debtor's Rejection of a Potentially Executory Contract with Kentucky Employees

Retirement System ("KERS"), be and hereby is, **GRANTED**. Debtor Seven Counties Services, Inc.

is entitled to reject its executory contract with KERS pursuant to 11 U.S.C. § 365 as being within

its sound business judgment.

Joan A. Lloyd
United States Bankruptcy Judge

Dated: May 30, 2014

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| SEVEN COUNTIES SERVICES, INC. | ) | CASE NO. 13-31442(1)(11) |
| | ) | |
| _____Debtor_____ | ) | |
| | ) | |
| KENTUCKY EMPLOYEES RETIREMENT SYSTEM | ) | AP No. 13-03019 |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SEVEN COUNTIES SERVICES, INC. | ) | |
| | ) | |
| _____Defendants_____ | ) | |

## JUDGMENT

Pursuant to the Memorandum Opinion entered this date and incorporated herein by reference,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that Judgment is entered in favor of Debtor/Defendant Seven Counties Services, Inc. and against Plaintiff Kentucky Employment Retirement System on its Complaint herein. The Complaint of Kentucky Retirement System is dismissed with prejudice.

Joan A. Lloyd
United States Bankruptcy Judge
Dated:  May 30, 2014